Mabel FERGUSON

v.

Attorney General ASHCROFT, the Federal Bureau of Prisons, Kathleen Hawk Sawyer, Ronald G. Thompson, and Tracy Ennen

United States of America

v.

Mabel Ferguson.

No. CIV. 03–122–D–M3,
No. CRIM. 02–09–D–M3.

United States District Court,
M.D. Louisiana.

Feb. 27, 2003.

---

**110.** *See* 21 U.S.C. § 846; 21 U.S.C. § 841(b)(1)(A).

Jean M. Faria, Federal Public Defenders Office for Middle & Western District, Baton Rouge, LA, for Plaintiff.

*RULING & ORDER*

BRADY, District Judge.

Pending before the court are two consolidated actions brought by petitioner Mabel Ferguson against the United States and various of its agents in their official capacities (collectively referred to as the "Government"). The core of her complaint is that the Department of Justice and the Bureau of Prisons ("Bureau") have violated her federal constitutional and statutory rights by changing their interpretation of the Bureau's discretion to place certain classes of convicts directly into community confinement centers. The Bureau has regarded itself as having that discretion for decades and, in fact, exercised it in Ms. Ferguson's favor in August of 2002. The Department of Justice has since reconsidered the relevant statutory language. It now thinks the Bureau's earlier acts of discretion were "unlawful." Based on this opinion, the Bureau has informed the federal courts that it will no longer exercise its former discretion. More importantly, for Ms. Ferguson, the Bureau has informed her that she will be transferred from a community confinement center to a federal prison camp. It is this transfer that Mabel Ferguson seeks, in one way or another, to stop.

In her first action Ms. Ferguson requests that this court issue a preliminary injunction against the Bureau, and its leadership in the persons of United States Attorney General John Ashcroft, Bureau Director Kathleen Hawk Sawyer,[1] the Bureau's Regional Director for the South Central Region, Ronald G. Thompson, and Tracy Ennen, who is the Community Cor-

---

1. The court notes that Ms. Sawyer has announced her retirement since this case was instituted. When her retirement becomes effective she will be replaced by Harley Lappin.

*See* Press Release, Department of Justice, Kathleen Hawk Sawyer to Retire; Harley Lappin to be Appointed as New Director (Feb.

rections Manager for the same region of the Bureau.[2] The injunction Ms. Ferguson seeks would prevent the Bureau from transferring her from her current place of confinement to a federal prison camp in Bryan, Texas. In the alternative, Ms. Ferguson asks this court for a preliminary injunction so that she may seek at a later hearing to have the court vacate her prior sentence and sentence her to a shorter term that will allow her to remain at the community confinement center until her release.

Formally, this matter comes to the court on the following three motions: (1) a motion for an emergency stay which, pursuant to Federal Rule of Civil Procedure 8(f),[3] this court treated as two motions, one for a temporary restraining order and another to vacate her sentence under 28 U.S.C. § 2255;[4] (2) a petition for a writ of habeas corpus under 28 U.S.C. § 2241 challenging the manner of her incarceration;[5] and (3) a complaint seeking declaratory and injunctive relief under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 553, 702, and 706 with jurisdiction predicated on 28 U.S.C. § 1331.[6]

The court issued a temporary restraining order ("TRO") on January 28, 2003.[7] By consent of the parties, the court extended the temporary restraining order until February 21, 2003.[8] The court heard oral argument on that day. Based upon the arguments presented in the parties' briefs and at oral argument, the court determines that Ms. Ferguson has met her burden under the standard for preliminary injunctions on the APA and § 2241 claims. Additionally, by consent of the parties and representations made to the court by counsel for the Government, any issues regarding procedural defects or service were waived for the purposes of the preliminary injunction hearing so that all parties can get to the next step.[9] Accordingly, the court hereby grants Ms. Ferguson's motion and enjoins the Government from transferring her from the Ecumenical House Community Corrections Center pending a final determination on the merits.

## FACTUAL BACKGROUND

In late 2000, the United States Attorney's Office confronted Mabel Ferguson

---

11, 2003) *available at* <http://www.bop.gov> via "Public Info" and "Press Releases" links (visited Feb. 19, 2003). The court has no doubt that it can accommodate this change in direction by substituting parties if necessary.

**2.** Ms. Ennen is currently the acting Community Corrections Manager. At the time of these events she was one of then-Community Corrections Manager Ray Aguado's Community Corrections Specialists. It was Aguado who notified Ms. Ferguson of her pending redesignation. Apparently, Mr. Aguado has also left his former position with the Bureau.

**3.** Petitions filed under 28 U.S.C. § 2255 are subject to the Federal Rules of Civil Procedure where no procedure is specifically designated by the Section 2255 Rules. *See* Section 2255 Rule 12 (2003)("If no procedure is specifically prescribed by these rules, the district court may proceed in any lawful manner not inconsistent with these rules...and may apply

the Federal Rules of Criminal Procedure or the Federal Rules of Civil Procedure, whichever it deems most appropriate to motions filed under these rules."). Thus, finding no applicable procedure under the Section 2255 Rules, the Court rules that the very unusual circumstances that this case arises under warrant an application of Federal Rule of Civil Procedure 8(f).

**4.** Docket No. 12.

**5.** Docket No. 1 (civil case).

**6.** Docket No. 1 (civil case).

**7.** Docket No. 16.

**8.** Docket No. 18.

**9.** Docket No. 24.

with charges of misappropriation of postal funds, a violation of 18 U.S.C. § 1711.[10] She signed a waiver of her right to have the charge made by indictment before a Grand Jury and the Government instead charged her with misappropriation by information on January 8, 2001.[11] The presentence investigation report, prepared on March 23, 2002, indicated that Ms. Ferguson has a criminal history category of I (the lowest level) and that her offense level was 13. This categorization placed her at the lowest level of Zone D of the Sentencing Guidelines Sentencing Table, subject to a term of imprisonment between twelve and eighteen months.

On March 28, 2002, Mabel Ferguson appeared before this court and entered a plea of guilty to the misappropriation charge.[12] The court released Ms. Ferguson on her own recognizance until the sentencing hearing. On July 11, 2002, the court imposed a sentence of twelve months and one day imprisonment, three years of supervised release immediately following said term of imprisonment, restitution payable immediately in a lump sum to the United States Postal Service,[13] and a mandatory $100 assessment.[14] The court recommended that "the defendant serve her sentence at the Ecumenical House Community Corrections Center in Baton Rouge, Louisiana"[15] and ordered that she surrender herself "for service of sentence at the institution designated by the Bureau of Prisons" before 2:00 p.m. on August 12, 2002.[16]

The Bureau, acting pursuant to a statutory grant of authority, decided that it should follow this court's recommendation and ordered that Ms. Ferguson serve her term of imprisonment at the Ecumenical House. This designation allowed Ms. Ferguson to work as the daycare provider for her infant grandchild during the daytime, but required that she otherwise be confined to the community center.[17] Ms. Fer-

---

10. Docket No. 1.

11. Docket No. 2.

12. Docket No. 6.

13. At the time of sentencing, Ms. Ferguson was in the process of declaring bankruptcy, but she managed to satisfy most of the restitution by cashing out her accrued leave and her pension plan at the U.S. Postal Service.

14. Docket Nos. 10 & 11.

15. Docket Nos. 10 & 11 at 2.

16. *Id.*

17. Community Corrections Centers are popularly known as "halfway houses." The popular name is not perfectly accurate, however, because it elides a distinction between the programs offered there. CCCs offer two programs, a "Community Corrections Component" and a "Prerelease Component."

　(1) The Community Corrections Component is designed as the most restrictive option. Except for employment and other structured program activities, an inmate in this component is restricted to the CCC. An inmate shall ordinarily be placed in the Community Corrections Component upon arrival at the CCC.

　(2) The Prerelease Component is designed to assist inmates making the transition from an institution setting to the community. These inmates have more access to the community and family members through weekend and evening passes.

Federal Bureau of Prisons, Policy Statement 7310.04, *Community Corrections Center (CCC) Utilization and Transfer Procedure,* ¶ 7a. Thus, not everyone who is in a halfway house is halfway between jail and home. These facilities are used for different purposes. Some CCC inmates enter these facilities after long terms in prison. For them, the facility is intended literally as a halfway house. "CCCs provide an excellent transitional environment for inmates nearing the end of their sentences. The level of structure and supervision assures accountability and program opportunities in employment counseling and placement, substance abuse, and daily life skills." *Id.* at ¶ 1. For others, committed for short terms either entirely or largely in CCCs, their

guson surrendered herself at the appointed place and time on August 12, 2002, and began serving her sentence.

Meanwhile, the Department of Justice decided to reevaluate the very statutory grant of authority that the Bureau exercised in assigning Ms. Ferguson to the Ecumenical House. According to the Bureau at the time of Ms. Ferguson's sentencing, 18 U.S.C. § 3621(b) gave it the discretion to commit people convicted of Zone C and D felonies directly to CCCs even though the federal district courts do not have such discretion in imposing their sentences.[18] The crucial passage appears in 18 U.S.C. § 3621(b), which is entitled "Place of imprisonment." That section provides:

> The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering—
>
> (1) the resources of the facility contemplated;
>
> (2) the nature and circumstances of the offense;
>
> (3) the history and characteristics of the prisoner;

> (4) any statement by the court that imposed the sentence—
>
>   (A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or
>
>   (B) recommending a type of penal or correctional facility as appropriate; and
>
> (5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28.[19]

According to the Bureau's understanding of that section from the time it became effective in 1987 until December of 2002, it gave the Bureau authority to "designate an offender directly to a community based facility to serve his or her sentence," though "ordinarily this is done only with the concurrence of the sentencing court."[20] As these remarks make clear, the Bureau's policy was that its discretion under this statute is broader than the discretion of the district courts.

Indeed, it would have to be in order to commit a defendant like Ms. Ferguson, convicted of a Zone D felony, directly to a CCC. For the discretion of the district courts is constrained by statute to follow the Sentencing Guidelines ("Guidelines") promulgated by the United States Sentencing Commission.[21] That statute provides:

> The court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) unless the court

programs are meant to punish while allowing the inmate to retain employment and some contacts with the community. Ms. Ferguson is in the latter category of inmate. To avoid the common connotation associated with the term "halfway house," then, the court will refer to these penal institutions as community confinement centers or CCCs.

**18.** 18 U.S.C. § 3553(b).

**19.** 18 U.S.C. § 3621(b).

**20.** U.S. Department of Justice, Federal Bureau of Prisons, *Judicial Resource Guide to the Federal Bureau of Prisons*, 16 (2000). *See also*, Federal Bureau of Prisons, Policy Statement 7310.04, *Community Corrections Center (CCC) Utilization and Transfer Procedure*, ¶ 5.

**21.** 18 U.S.C. § 3553(b).

finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.

Guideline § 5C1.1(f), in turn, provides that "[i]f the applicable guideline range is in Zone D of the Sentencing Table, the minimum term shall be satisfied by a sentence of imprisonment." [22]

Compare the applicable Guideline for a Zone C felony:

> If the applicable guideline range is in Zone C of the Sentencing Table, the minimum term may be satisfied by—
>
> (1) a sentence of imprisonment; or
>
> (2) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention according to the schedule in subsection (e), provided that at least one-half of the minimum term is satisfied by imprisonment. [23]

As this language is widely understood, the distinction it embodies between imprisonment and commitment to a CCC requires that district courts impose a sentence of imprisonment for at least half the minimum term of imprisonment of all Zone C felons.

■ Zone D felons who must be given a "sentence of imprisonment," with no provisions whatsoever made for terms of supervised release on condition of service in a CCC, cannot be committed directly to CCCs by the district courts either. [24] Judges may, however, direct placement in a CCC as a condition of supervised release *after* a term of imprisonment. [25] It is only when it comes to the term of imprisonment itself that judges cannot decide on the place it will be carried out.

But this is a general disability of the courts. The statutory scheme grants exclusive authority to the Bureau to decide where a convict will serve her sentence of imprisonment. The constraints on judges concern whether they need to commit convicts to the Bureau in the first place. For all, and only, those convicts who must serve terms of imprisonment under the Guidelines are committed to the custody of the Bureau. [26] Once committed to the Bureau, only the Bureau can determine the place of imprisonment. [27] The Guidelines

---

**22.** UNITED STATES SENTENCING GUIDELINES MANUAL § 5C1.1(f).

**23.** UNITED STATES SENTENCING GUIDELINES MANUAL § 5C1.1(d).

**24.** *See United States v. Serafini,* 233 F.3d 758, 777 (3d Cir.2000) ("It is true that under section § 5C1.1 of the Guidelines, "community confinement" cannot constitute "imprisonment" for purposes of fulfilling the requirement that one-half of a split sentence be satisfied by imprisonment"); *United States v. Adler,* 52 F.3d 20, 21 (2d Cir.1995) ("We agree with the government that the district court's interpretation of Sections 5C2.1(d) and (e) is erroneous. 'Imprisonment' and 'community confinement' are not synonyms"); *United States v. Swigert,* 18 F.3d 443, 445 (7th Cir.1994) ("Section 5C1.1 plain-

ly draws a distinction between 'imprisonment' and either community confinement or home detention").

**25.** *See United States v. Jalili,* 925 F.2d 889, 892 (6th Cir.1991) ("'[W]e read Guideline § 5C1.1(d), which states that 'the minimum term may be satisfied by (1) a sentence of imprisonment; or (2) a sentence of imprisonment that *includes a term of supervised release with a condition* that substitutes community confinement or home detention according to the schedule of § 5C1.1(3),' to mean that community confinement may be included as a condition during the term of supervised release") (emphasis in opinion).

**26.** 18 U.S.C. 3621(a).

**27.** 18 U.S.C. 3621(b).

provisions concerning community confinement have to do with the courts' authority to sentence convicts to terms of supervised release or probation, which is only available to Zone A and certain B felons. Over these sentences, the courts have authority and *can*, under the Guidelines, direct that these terms be served in CCCs. But, the courts' authority is more limited where service of sentences of imprisonment is concerned.

According to the longstanding practice and policy established at the time of Ms. Ferguson's sentencing, only the Bureau could deviate from these constraints upon the judiciary. But, that practice was challenged only four months after Ms. Ferguson began serving her time at the Ecumenical House. The Department of Justice commissioned a memorandum from the Office of Legal Counsel ("OLC") seeking an opinion whether the Bureau had all the discretion it supposed itself to have. As the OLC read the statute and related documents, the entire practice was "unlawful." It concluded that rather than grant the Bureau complete discretion in assigning prisoners, 18 U.S.C. § 3621 actually cabined the Bureau's discretion within the same constraints that are placed on the federal judiciary by the Sentencing Commission. According to the OLC, with respect to sentencing discretion, the Judiciary and the Bureau of Prisons are bunkmates to the Sentencing Commission's camp counselor.

This change in policy took effect rapidly and without remorse. Principle Deputy Assistant Attorney General M. Edward Whelan III of the OLC released a memorandum opinion entitled "Bureau of Prisons Practice of Placing in Community Confinement Certain Offenders Who Have Received Sentences of Imprisonment" on December 13, 2002 ("OLC Memo").[28] The OLC Memo concluded that the Bureau acted unlawfully in placing Zone C and Zone D felons directly into CCCs. On December 20, 2002, Kathleen Hawk Sawyer, Director of the Bureau, sent her own memorandum to federal judges informing them of the conclusion of the OLC memorandum and that the Bureau no longer would follow its prior practice.[29] Under a new Bureau "policy," future Zone C and D felons would never again be committed directly to CCCs under any circumstances and regardless what sentencing judges recommend. Though the OLC Memo does not discuss the matter, it also appears that the new "policy" applies equally to Zone B felons, or any felon sentenced to a term of imprisonment, because it is the position of the Bureau that the phrase "term of imprisonment" as it appears in 18 U.S.C. § 3621(b) does not include time spent in community confinement centers.[30]

---

**28.** Plaintiff's Exhibit C; *see* Memorandum Opinion for the Deputy Attorney General, *Bureau of Prisons Practice of Placing in Community Confinement Certain Offenders who have Received Sentences of Imprisonment*, (hereinafter "OLC Memo") available at <*http://www.usdoj.gov/olc/bopimprisonment2 .htm*> (visited February, 10, 2003).

**29.** Plaintiff's Exhibit D.

**30.** That the policy also applies to Zone B felons is particularly important for any convicts who commit a felony that does not allow for probation. The courts may sentence a Zone B felon to "a sentence of probation that includes a condition or combination of conditions that substitute intermittent confinement, community confinement, or home detention." Thus, they may for the most part escape the impact of the new Bureau policy for those felons by putting them through the probation system rather than the "imprisonment system." For those Zone B felons whose offenses forbid probation, however, the courts will be without authority and they will uniformly serve some time in prisons.

Also buried at the bottom of that memorandum was the following notice:

> This procedure change will be implemented prospectively, with the following exception. Inmates designated to CCCs who, as of December 16, 2002, had more than 150 days remaining to serve on their prison terms, will be re-designated by the Bureau to prison institutions.

Neither that memorandum nor any other communication offered to this court attempts to explain the rationale for the determination that the new "policy" should be applied in a selectively retroactive manner.[31]

Nevertheless, retroactively applied it was. In yet another memorandum, dated December 27, 2002, Ray Aguado, Community Corrections Manager, informed Mabel Ferguson that:

> [Y]ou will be re-designated by the Bureau of Prisons (Bureau) to a prison or jail institution within the next 45 days, but not sooner than 30 days from receipt of this notice, for continued service of your prison sentence.
>
> Your transfer results from a Bureau procedure change, which complies with recent guidance from the U.S. Department of Justice's Office of Legal Counsel (OLC), finding that the term "community confinement" is not synonymous with "imprisonment."[32]

This memo also informed Ms. Ferguson that the policy would be applied retroactively—a point she no doubt picked up in reading its first sentence. Though the letter explained the decision to change the policy on discretion-insofar as the synonymy argument is an explanation-it did not provide any rationale for its retroactivity. The memo concluded by informing her that "[i]f you are dissatisfied with this decision, you may challenge it through the Bureau's administrative remedy program."

On January 28, 2003, Mabel Ferguson filed a "Motion for Emergency Stay" with this court seeking a TRO against the enforcement of the new Bureau policy against her. The court held a conference with both parties and granted the TRO on that same day. Subsequently, by consent of the parties, the court extended the order until a hearing on the matter could be held on February 21, 2003. Mabel Ferguson filed motions seeking relief under 28 U.S.C. § 2255 and 28 U.S.C. § 2241, which both provide jurisdiction, and under 5 U.S.C. § 552, which gives the court jurisdiction because it presents a federal question.

## PRELIMINARY INJUNCTION STANDARD

In order to prevail on her motion for preliminary injunction under any of her causes of action, Ms. Ferguson must establish that: (1) there is a substantial likelihood that she will prevail on the merits; (2) there is a substantial threat that she will suffer irreparable injury if the preliminary injunction is denied; (3) the threatened injury to her outweighs the threat-

---

**31.** Briefs from the Government indicate that the line is drawn at convicts who had 150 days or more remaining on their sentences out of a concern that the Bureau not be forced to move convicts from CCCs to prisons, only to have to return them shortly thereafter. That may or may not be the case. Legal briefs are not evidence. But, the Government is not under any burden to produce evidence that it has a rational basis for its action. That burden falls upon Ms. Howard. While the court applauds the Government's occasional concern for economy and encourages it to have such matters in mind when deciding what policies to pursue, it bears noting that the purported rationale for distinguishing among CCC-committed convicts based on the time left on their sentences has absolutely no bearing whatsoever on the reasonableness of applying the new policy retroactively in the first instance. No one has offered any explanation of that decision.

**32.** Plaintiff's Exhibit A.

ened injury to the Government; and, (4) granting the preliminary injunction will not disserve the public interest.[33]

Ms. Ferguson presents claims under three very different theories of law. A winning argument under any one theory will entitle her to a preliminary injunction. The court finds that she has presented two such theories. For the purposes of this preliminary injunction ruling, the real battle is over the question whether Ms. Ferguson can show that she has a substantial likelihood of success on the merits of her claims. All of the other factors, irreparable injury, balance of harms, and public interest weigh easily in her favor. However, for completeness, the court will begin with a brief discussion of these factors.

There is no doubt that Ms. Ferguson would be irreparably injured if she were transferred from Ecumenical House. She would be ripped from her job, her family, and her community. Any dignity she had managed to recover would be lost. She would suffer financially and would be joined in that fate by her extended family who rely on her for affordable childcare. Were the court later to rule in her favor, she would have no relief at all.

Meanwhile, the Government hardly can make out the claim that it has an interest in this transfer. By allowing her to remain at Ecumenical House until a final ruling on the merits, she will be able to continue paying for the costs of her incarceration. Already she has paid $1,700.[34] Any Government interest in transferring her is outweighed by the cost of doing so as well as the cost of incarcerating her where she will be unable to continue paying for her own upkeep. Moreover, because the Bureau has already designated Ecumenical House as the location of Ms. Ferguson's imprisonment and she has already served more than half of her sentence there, there is no potential harm to the public interest in allowing her to remain there.

Indeed, the only particularized Government evaluation of its own interests regarding Ms. Ferguson's incarceration is that provided by the Bureau in assigning her to the Ecumenical House in the first place. Ms. Ferguson has been a model prisoner, and allowing her to remain there ensures that her ties to the community and chances for rehabilitation are not crippled. Surely the public has an interest in returning criminals to society as good citizens living life on the right side of the law. And, surely that interest outweighs the Bureau's interest in enforcing a new "policy" retroactively by transferring Ms. Ferguson to a new location for a few months. Additionally, any "tough on crime" message the Government wished to send by making these redesignations has already made its dent in the national consciousness.[35]

---

**33.** See Walgreen v. Hood, 275 F.3d 475, 477 (5th Cir.2001) (citing Sierra Club v. FDIC, 992 F.2d 545, 551 (5th Cir.1993)).

**34.** Stipulated Facts, Docket No. 23 (entered in open court).

**35.** See Dan Eggen, White Collar Crime Now Gets Real Time, WASHINGTON POST, January 7, 2003, at A6. This place seems as good as any that will come to ask the question that must hound any of the hundreds of people who now find themselves spending hours out of their days supporting, fighting, or evaluating this new "policy": What is the point? The question has a special force in cases where the Government seeks to apply the "policy" retroactively. For, as the Supreme Court remarked in another context in United States v. Addonizio, "Inroads on the concept of finality tend to undermine confidence in the integrity of our procedures. Moreover, increased volume of judicial work [...] inevitably impairs and delays the orderly administration of justice." 442 U.S. 178, 185 n. 11, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979). And indeed, that is what the courts see today. The court is told that 132 people are threatened with the recoil of bureaucratic activism. And each judge is

Therefore, on the basis of the above and the Government's failure to offer any argument in opposition, the court concludes that Ms. Ferguson has met her burden, and a preliminary injunction ruling in her favor is warranted on these factors. For the reasons given below, the court determines as well that Ms. Ferguson is substantially likely to prevail on the merits.

## JURISDICTION

### I. Jurisdiction Under 28 U.S.C. § 2255, 28 U.S.C. § 2241, & 28 U.S.C. § 1331

The government asserts that this court does not have jurisdiction to hear Ms. Ferguson's complaints about her treatment under the new Bureau of Prisons "policy." Ms. Ferguson, meanwhile, proposes several possible bases for the court to exercise its authority. First, she argues that the court may exercise its jurisdiction under 28 U.S.C. § 2255 to hear any claim attacking the validity of her sentence or conviction. Second, she urges that the court also has jurisdiction under 28 U.S.C. § 2241, the writ of habeas corpus, to hear claims challenging the manner in which her sentence is being carried out. Finally, she asserts that the court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 to hear her claim that the Department of Justice and the Bureau have violated the her rights under the APA.

Before deciding which procedural mechanism allows the court to act on Ms. Ferguson's case, the court must distinguish her claims and the actions of which they complain. As discussed above, Ms. Ferguson's primary complaint concerns a series of actions taken by various bureaucrats within various branches of the Department of Justice. She objects to the imposition of a new rule upon the procedures of the Bureau that issued from the Department of Justice. That new rule was based wholly, as far as the court can determine, on the OLC Memo. The OLC Memo expresses the opinion that it is "unlawful" for the Bureau of Prisons to place convicts directly in community correction centers rather than in penal facilities such as prisons or jails.[36] She objects to this interpretation as well as the method of its adoption. She also objects to the separate decision, apparently taken by another official at the Department of Justice or the Bureau, to apply this policy retroactively so that it affects people like herself, who was well into her term at a CCC by the time she received notice that she would be moved into a federal prison camp.

Her complaints, already legion, march on. She also claims that the complained of

---

surrounded by a bevy of lawyers, mainly busy people from the United States Attorney's Office and the Federal Public Defender's Office who would gladly, the court imagines, not re-fight old sentencing battles. So again the question: What is the point? In response, the court is told that the Bureau's former practice—a practice that apparently dates back half a century uninterrupted—was "unlawful." Oh, what a blunt instrument that remark! If explanation we sought, exasperation we have surely found. For even beyond the lack of fairness and even beyond the waste of time and resources we still must ask-what comes of this new "policy"? If it were upheld, are judges really expected to march along unaffected by their awareness of it?

No. As Judge Huevelle remarked in her opinion in a similar case, *Culter v. United States,* 241 F.Supp.2d 19 (D.D.C.2003), judges know full well how all these provisions work together and make their judgments accordingly. If the motivation of the Department of Justice was to grab headlines about longer sentences for minor white-collar criminals while in fact ensuring that in the long run their sentences are shorter, then congratulations are in order. This "policy" is just the trick. Otherwise, if the court may presume, perhaps the next time the Department of Justice and the Bureau decide that it's time to get religion, they will seek comment from without.

**36.** *See* OLC Memo, *supra* note 28.

bureaucratic declaration and the decisions that seek to effectuate it have infected the validity of her initial sentence. They have done so, she argues, by uprooting and throwing out the settled background assumptions against which the court exercised its discretion at the time it made its sentencing decision. She urges that the new "policy" vitiates the court's intentions in imposing the sentence it did.

Ms. Ferguson, then, challenges the validity of several actions of several individuals that will, left unchanged or unchecked and taken together, take her out of her community and throw her into a prison, despite initial judicial and agency determinations that to do so would not be in anyone's best interest in this case. Some of these acts are administrative and may be attacked directly insofar as they affect the Ms. Ferguson's interests. The same administrative acts may be attacked insofar as they affect the manner in which her sentence will be served. Others concern the imposition of Ms. Ferguson's sentence itself.

█ Only those claims that attack the validity of Ms. Ferguson's sentence can be brought under 28 U.S.C. § 2255. Her complaints regarding the manner of her imprisonment must be filed via a petition for the writ of habeas corpus under 28 U.S.C. § 2241. The distinction between the two habeas causes of actions is clear. Both offer post-conviction relief, but the relief available and often the court which a prisoner must petition are distinct. A section 2255 petition for post-conviction relief allows an inmate to attack the validity of a conviction or sentence collaterally and must be sought in the sentencing court.[37] Section 2255 reads:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

A motion for such relief may be made at any time.

[.    .    .    .]

If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge [or resentence the prisoner] or grant a new trial or correct the sentence as may appear appropriate.[38]

Among Ms. Ferguson's assertions is the claim that the subsequent change in the law (if legitimate) undermined the validity of her sentence. This court is the proper court to hear this claim because it is the here that her sentence was imposed in the first place. Consequently, as an initial matter, Ms. Ferguson has brought the right kind of claim to the proper court.

█ She also has properly brought her section 2241 claim to this court. The writ

---

37. See *Pack v. Yusuff,* 218 F.3d 448, 451 (5th Cir.2000); see also *United States v. Jordan,* 915 F.2d 622, 629 (11th Cir.1990); *Doganiere v. United States,* 914 F.2d 165, 169 (9th Cir. 1990); *United States v. Long,* 787 F.2d 538,

539 (10th Cir.1986); *Higdon v. United States,* 627 F.2d 893, 897 (9th Cir.1980); *Grimes v. United States,* 607 F.2d 6, 9–10 (2d Cir.1979).

38. 28 U.S.C. § 2255.

of habeas corpus allows convicts to challenge the manner that their sentences are being carried out. That section provides:

(a) Writs of habeas corpus may be granted by the [ . . . ] district courts [ . . . ] within their [ . . . ] jurisdictions. [ . . . ]

(c) The writ of habeas corpus shall not extend to a prisoner unless—

(1) [The prisoner] is in custody under or by color of the authority of the United States [ . . . ] or [ . . . ]

(3) [The prisoner] is in custody in violation of the Constitution or laws or treaties of the United States.[39]

Such petitions can be brought only in a district court in the district where the convict is incarcerated because the court must have power over the convict's custodian to effect a remedy.[40] As it happens, Ms. Ferguson was not only sentenced in this court but remanded into custody here as well. She currently resides at the Ecumenical House, Baton Rouge, Louisiana. Because Ms. Ferguson attacks the manner in which her sentence is being carried out and she is also incarcerated here, her petition is proper.

■ There is, however, one remaining potential barrier to the court's taking jurisdiction over this matter under either section 2255 or section 2241. It is the Government's claim that this court does not have jurisdiction to hear these habeas claims because, even if Ms. Ferguson has been wronged, the quantum of that wrong is insufficient to warrant review under the federal habeas statute or the writ of habeas corpus. Those remedies require that the wrong be constitutional, jurisdictional, or of fundamental unfairness. That, the Government argues, Ms. Ferguson cannot do, and it refers the court to the Supreme Court's decision in *United States v. Addonizio.*[41]

*Addonizio* presents facts that are somewhat similar to those in this case. In 1970, Mr. Addonizio, once the Mayor of Newark, New Jersey, found himself up for sentencing after being convicted of 63 counts of extortion and one count of conspiracy to extort. The presiding judge sentenced Mr. Addonizio to a ten-year term of imprisonment.[42] He made this sentence, he later said, under the impression "that petitioner would be actually confined for a period of approximately three and one-half to four years of the ten-year sentence."[43] The district judge formed this expectation based on the "fact that [Mr. Addonizio] was a first-offender and that there appeared to be little probability of recidivism" as well as his understanding that these were the primary factors used to determine when and whether to offer parole to a convict.[44] As it turned out, the Probation Commission frustrated the district judge's expectations by adopting new parole procedures.

Specifically, the Parole Commission determined that the gravity of the offense should be a significant factor at parole hearings. The Parole Commission started using its new guidelines on a trial basis in 1972, published them in the Federal Register and began using them throughout the country in 1973, and later codified them at 28 CFR § 22.20 (1978).[45] Based on the gravity of Mr. Addonizio's offenses—extreme breach of the public trust—the Pa-

---

39. 28 U.S.C. § 2241.

40. *Pack,* 218 F.3d at 451; *United States v. Clinkenbeard,* 542 F.2d 59, 60 (8th Cir.1976).

41. 442 U.S. 178, 99 S.Ct. 2235, 60 L.Ed.2d 805.

42. *Addonizio,* 442 U.S. at 180, 99 S.Ct. 2235.

43. *Id.* at 181 n. 3, 99 S.Ct. 2235.

44. *Id.*

45. *Id.* at 182 n. 4, 99 S.Ct. 2235.

role Commission twice rejected his applications for parole when he applied in 1975.[46] Mr. Addonizio brought a motion under 18 U.S.C. § 2255 to vacate and resentence. The sentencing judge reduced his sentence to time served and the Second Circuit affirmed.

The Supreme Court, however, reversed this decision on the ground that the district court did not have jurisdiction to hear the matter because "subsequent actions taken by the Parole Commission—whether or not such actions accord with a trial judge's expectations at the time of sentencing—do not retroactively affect the validity of the final judgment itself." [47] The Supreme Court pointed out that "an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment" because the interests of finality and judicial economy require that closed cases be reopened only for very serious reasons.[48] Only three kinds of reason are sufficient: (1) claims of constitutional error; (2) claims that the court lacked jurisdiction; and, (3) claims that the court committed an error of fact or law of a fundamental character that "rendered the proceeding itself irregular and invalid." [49]

The Supreme Court's holding and rationale compel the same result in this case, the Government argues, because this court's expectations are no more entitled to be carried out than were the expectations of the district judge in *Addonizio.* They argue that, as a matter of law, the later activities of the Department of Justice and the Bureau cannot have infected the proceedings in this court so fundamentally as to give this court jurisdiction to hear the claim. The Government also argues that the court should also dismiss Ms. Ferguson's claims under section 2241 because the same standard governs there.

The court respectfully differs with the Government on this matter. There are many distinctions between the facts of *Addonizio* and the facts of this case. The district judge in *Addonizio* merely expected that the Parole Commission would operate under its old rules. His reliance was in the nature of an idle expectation based on an understanding of "how things work." The Parole Commission followed the requisite rulemaking procedures and eventually promulgated rules regarding the grant of parole that frustrated the district judge's intentions when, four or five years *after* the sentencing the Parole Commission applied those rules to Mr. Addonizio.

In Ms. Ferguson's case, however, the court was not merely speculating. The Bureau was on record that it had the discretion to commit certain classes of convicts to imprisonment in CCCs. It published that view in 1998 in Policy Statement 7310.04.[50] It has also published the view as recently as 2000 in a reference manual for the judiciary.[51] U.S. Attorneys, now

---

46. *Id.* at 182, 99 S.Ct. 2235.

47. *Id.* at 190, 99 S.Ct. 2235.

48. *Id.* at 184–85, 99 S.Ct. 2235.

49. *Id.* at 185–86, 99 S.Ct. 2235.

50. PS 7310.04, *Community Corrections Center(CCC) Utilization and Transfer Procedure,* ¶ 5 (12/16//1998) ("[T]he Bureau is not restricted by § 3624(c) in designating a CCC or an inmate and may place an inmate in a CCC for more than the 'last ten percentum of the term,' or more than six months, if appropriate.")

51. U.S. Department of Justice, Federal Bureau of Prisons, *Judicial Resource Guide to the Federal Bureau of Prisons* at 15–16 (2000) ("The Bureau may designate an offender directly to a community based facility to serve his or her sentence, but ordinarily this is done only with the concurrence of the sentencing court."). That same publication informs members of the judiciary of the kinds of convicts who might get assigned to CCCs:

compelled to spend hours fighting to move the affected convicts, once collaborated with the sentencing judges to ensure that these people were assigned to CCCs. Having, in many instances, accomplished the goal of achieving these assignments, they are now whipsawed by the new "policy" back into court to stand before the same judges in a much more adversarial position.

Also, unlike parole hearings, placement in a penal institution is a part of the sentencing process. In Ms. Ferguson's case, that process was fully completed and she was assigned to a CCC *before* the Government stepped in brandishing its new "policy." Conversely, in *Addonizio,* the felon was convicted and served some four or five years before he ever went before the Parole Commission. Moreover, no one in Ms. Ferguson's case was working off of "mere expectancies." The Bureau, the U.S. Attorney's Office, the court, Ms. Ferguson, and her attorney all *in fact knew* what would happen to her. She would be taken into custody at the Bureau, they would look at the particulars of her case, and given the nature of the crimes, they would assign her to a CCC so that she could maintain her connections to her community while at the same time giving up much of her freedom in order to pay back her debt to that same community. And that is precisely what happened. Until, that is, some Washington D.C. bureau-crat determined that the entire legal world had been acting under the same shared "unlawful" fantasy for decades and acted to bring us all back into step with his vision of the law.

Ultimately, however, it is the judgment of this court that this phase of the analysis does not concern jurisdiction to hear these claims. The remarks about jurisdiction in *Addonizio* and propounded by the Government in this case concern the district courts' jurisdiction *to vacate sentences,* not their jurisdiction to *consider whether* the claimed violation is serious enough to warrant such a measure.[52] In *Addonizio* the Supreme Court wrote, "[u]nder § 2255, the sentencing court is *authorized to discharge or resentence* defendant if it concludes that it 'was subject to collateral attack.'"[53] This remark does not indicate that the court does not have jurisdiction to hear the due process claim. Instead, it indicates that, having heard the claim and decided that the alleged injury is not of constitutional magnitude, the court cannot reclaim jurisdiction over the sentence and alter it in any way.

That this is so is evident from the courts that have rejected due process claims in similar cases. All three such cases to which the court has been referred reach the merits of the due process claims brought by complainants. All three refer to the governing due process standard for fairness at sentencing hearings—that a

---

Protecting public safety is the first priority when an inmate is considered for participation in community programs. The following is the profile of a typical offender designated directly to a CCC.

— Ordinarily sentenced to 6 months or less.
— Not involved in large-scale drug or property offenses.
— Has no detainers or pending charges.
— Has no history of serious violent behavior or firearms offenses.
— Has no history of sex crimes.
— No medical or mental disorder requiring ongoing treatment.
— Is not a deportable alien.
— Has no history of threats against government officials.
— Has no known memberships with disruptive groups or affiliations with major organized criminal enterprises.

*Id.* at 16.

**52.** *See Addonizio,* 442 U.S. at 185, 99 S.Ct. 2235.

**53.** *Id.*

sentencing within Guideline limits can be altered if the judge relied on materially false information in imposing the sentence—and all three reject the due process argument based in part on the claim that these courts did not in fact rely on the former Bureau practice.[54] Hence, this court concludes that the Government's jurisdictional arguments are more properly considered arguments on the merits and will consider them as such.

Ms. Ferguson has stated claims under the Administrative Procedures Act ("APA") as well. She claims that the new "policy" is a substantive rulemaking that, even if it were an acceptable interpretation of the statute, could not be put in place until the Department undertook notice and comment procedures required by section 552 of the APA. She also claims that the "policy" is based on a clearly erroneous interpretation of the Crime Control Act of 1984 and, for that reason, it is unenforceable against her. The court has jurisdiction to hear both of these claims under 28 U.S.C. § 1331.[55]

## II. Exhaustion

The Government also claims that the court cannot review the agency action or

Ms. Ferguson's sentencing because she has not exhausted her administrative remedies. The Fifth Circuit has held that before bringing a claim under 28 U.S.C. § 2241, "a federal prisoner seeking only injunctive relief must first exhaust the administrative remedies provided by the Bureau."[56] Similarly, to challenge an agency action under the Administrative Procedures Act, that action must be a "final agency action."[57] The Bureau has procedures available that would allow her to appeal her redesignation. Those procedures are provided at 28 C.F.R. §§ 542.10–542.19.

The administrative appeals process has three steps. First, the inmate must submit a "formal written Administrative Remedy Request, on the appropriate form (BP–9)" with the Community Corrections Manager ("CCM") twenty days from the act challenged.[58] The CCM has 20 days to respond to the request.[59] The inmate then has twenty more days to appeal to the Regional Director,[60] who has thirty days to respond.[61] If the inmate is still dissatisfied with the result, she may appeal to the General Counsel within an additional thir-

54. *U.S. v. Schild*, 2003 WL 260672, 2003 U.S. Dist. LEXIS 1703 at *4 (D.Kan.2003) ("[E]ven if the court had known that defendant would not qualify for work release, the court would have issued the same sentence. In other words, the alleged 'misinformation' was not 'material' "); *U.S. v. Herron*, 2003 WL 272170, 2003 U.S. Dist. LEXIS 1932 at *3 (D.Kan.2003) ("This court would render the same sentence even knowing the change in interpretation of the guidelines"); *U.S. v. Andrews*, at 638–39 (E.D.Mich.2003) ("Whether the B.O.P. would accept the court's recommendation was not material, nor even a factor, to the court's sentence of 7 months imprisonment").

55. *Walker v. Washington*, 627 F.2d 541, 545 (D.C.Cir.1980); *see also Pickus v. Bd. of Parole*, 507 F.2d 1107, 1109–11 (D.C.Cir.1974) (holding that prisoners can challenge agency

actions directly under the APA); *Brown v. Lundgren*, 528 F.2d 1050, 1054 (5th Cir.1976) ("The unavailability of habeas corpus does not mean that judicial review of the board's actions is completely unavailable. An increasing number of courts have found the Board of Parole to be subject to certain parts of the APA.").

56. *Rourke v. Thompson*, 11 F.3d 47, 50 (5th Cir.1993).

57. 5 U.S.C. § 704.

58. 28 C.F.R. § 542.14(a).

59. 28 C.F.R. § 542.18.

60. 28 C.F.R. § 542.15(a).

61. 28 C.F.R. § 542.18.

ty days.[62] The General Counsel has forty days to respond.[63] Ms. Ferguson admits that she has not completed her pursuit of an administrative remedy. Thus, the Government argues, she admits that she has no case before this court.

■ The court finds that Ms. Ferguson need not exhaust administrative remedies that are mere apparitions. While the Government is correct that the exhaustion doctrine normally bars direct resort to the courts, that is not true where pursuing administrative remedies would be futile "because it is clear that the claim will be rejected." [64] Where an agency has adopted a new rule or policy and announced that it will follow that policy, especially where that policy has its origin above the Bureau's General Counsel Office, it is pointless to require a complainant to follow the administrative procedure. The people who would review Ms. Ferguson's claims in the Bureau have absolutely no power to alter her designation. The new "policy" was based on an interpretation that was handed down from on high in the Department of Justice. Thus, an administrative appeal could only work to delay this matter.[65]

In fact, an administrative appeal would be more than futile in this case; it would completely destroy any hope that Ms. Ferguson has of avoiding redesignation and transfer to a federal prison. Even if Ms. Ferguson could put together her complaint and appeals in the proper form in no time at all, the Bureau would still have ninety days, all together, to respond to her re-quests for relief. Even had she filed a Request for Administrative Remedy on the very day she received her redesignation letter, she would only have been in the middle of her first appeal when the Bureau shuttled her off to prison. Because it is evident that she would not have received relief on appeal, it is also evident that she would have been sent to prison and served for some months before she ever would have had an opportunity to bring her claim before a tribunal—a federal district court—that might actually be able to afford her relief. And of course, Ms. Ferguson could not have exhausted her administrative remedies in no time at all. The most likely result is that she would have been released from prison before she ever got to federal court. By that time, the matter would have become moot. Under no conception of justice and due process is that an acceptable result. Accordingly, the court finds that Ms. Ferguson need not have exhausted the administrative appeals process and may pursue her claims directly in this court.

The Government also argues that the exhaustion requirement is stricter than normal because the Prison Litigation Reform Act ("PLRA") imposes a greater exhaustion burden on prisoners than what is required of other citizens. That Act states, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are

---

**62.** 28 C.F.R. § 542.14(a).

**63.** 28 C.F.R. § 542.18.

**64.** *Patsy v. Florida Int'l University,* 634 F.2d 900, 904 (5th Cir.1981), *reversed on other grounds by Patsy v. Board of Regents,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172; *see also DCP Farms v. Yeutter,* 957 F.2d 1183, 1189 (5th Cir.1992).

**65.** *See Tasby v. Pratt,* 2002 WL 1160071 at *2 (N.D.Tex.2002) ("[W]here, as here, the Bureau has adopted the policy and instructed its staff in the form of a Program Statement that inmates are ineligible for early release under the circumstances of this case, the court finds that presentation of Tasby's claims to the Bureau at the regional and national levels would, in fact, be futile").

exhausted."[66] While it is certainly true that this provision does destroy the futility exception in some cases, it is equally certain that it does not do so here. Where a petitioner is not only unable to prevail by going through the proper procedures as a matter of plain agency policy, but by doing so would be completely deprived of any hope of relief, the exhaustion requirement under the PLRA does not bar relief in the courts.[67]

■ The reason for this rule is that where futility of such an extreme sort is present, the administrative remedies either do not exist or they are *de facto* exhausted. The Supreme Court recognized this result as a presupposition of the terms "available" and "remedy" in the PLRA.[68] "[S]ome redress for a wrong is presupposed by the statute's requirement of an 'available' 'remed[y]'; neither [party] argues that exhaustion is required where the relevant administrative procedure lacks authority to provide any relief or to take any action whatsoever in response to a complaint."[69] The exhaustion requirement is therefore satisfied.

## ANALYSIS

### I.  The APA Claims—Rulemaking

The majority of Ms. Ferguson's civil claims are encompassed by the provisions of the APA. This is because the bulk of her federal constitutional claims are more properly considered as part of her 28 U.S.C. § 2241 claim, which is analyzed

separately below. As a general matter, the APA applies to all federal agencies, including the Bureau.[70] There are a few limitations to the applicability of the APA to the Bureau, however, contained in 18 U.S.C. § 3625. These limitations have no applicability in cases such as this, where the challenge is not an adjudication of an individual case, but instead, a challenge to a rule making.[71]

At the outset, the court observes that the "policy" change enacted by the Bureau by the stroke of a bureaucratic pen in the waning days of 2002 looks a whole lot like a "rule" for the purposes of the APA. The APA defines the term "rule" as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law...." The Bureau's new "policy" of prohibiting direct commitment of felons to CCC's under any circumstances, and the redesignation of previously committed felons like Ms. Ferguson because she had more than 150 days left to serve are most certainly "statement[s] of general applicability."

■ Under ordinary circumstances, an agency that wishes to issue a rule must abide by the APA's notice and comment procedures. Additionally, although agency "interpretations" are not typically subject to notice and comment procedures,[72] when an interpretation departs from a long-standing agency practice, it too must be promulgated pursuant to the general APA notice and comment procedures.[73] There

---

**66.** 42 U.S.C. § 1997e(a).

**67.** *See Johnson v. True,* 125 F.Supp.2d 186 (W.D.Va.2000).

**68.** *Booth v. Churner,* 532 U.S. 731, 736 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001).

**69.** *Id.*

**70.** *See Harris v. Mut. of Omaha Cos.,* 992 F.2d 706, 712 (7th Cir.1993).

**71.** *See* S. REP. 98–225, 149, 1984 U.S.C.C.A.N. 3182, 332; *Martin v. Gerlinski,* 133 F.3d 1076, 1079 (8th Cir.1998).

**72.** *See Venegas v. Henman,* 126 F.3d 760, 763 (5th Cir.1997).

**73.** *See Shell Offshore Inc. v. Babbitt,* 238 F.3d 622, 630 (5th Cir.2001).

is no doubt that the new Bureau "policy" is the exact opposite from its past policy and practice with regard to direct CCC commitments. Thus, under either rulemaking theory, it is highly probable that the court could conclude that the Bureau has issued a "rule" that requires notice and comment. The Government admits that the Bureau has not complied with the requirement for notice and comment. Thus, Ms. Ferguson has shown a likelihood of success on the merits that the "rule," and its subsequent application to her, are invalid, thereby making a preliminary injunction on this issue warranted.

## II. The APA Claims—Validity of the New Interpretation

Even if notice and comment were not required, the court still must consider whether the Bureau's "interpretation" was a permissible construction of the relevant statute. In reaching this determination, the question the court faces is whether confinement in a community corrections center is a form of imprisonment under the statute. If it is a form of imprisonment under 18 U.S.C. § 3621(b), then the Bureau has a clear grant of statutory authority to exercise its discretion and place people convicted of Zone C and Zone D felonies directly to CCCs, despite the fact that federal district courts do not have that authority under the Guidelines.[74] If

such confinement, on the other hand, is not a form of imprisonment, then the scope of the Bureau's discretion to designate places of imprisonment does not reach CCCs and the Bureau may not assign inmates to those institutions unless it acts under some other grant of authority. The court begins by noting that the Department appears to be the proper agency to undertake to interpret the statutory provisions concerning the Bureau.[75] As such, its interpretation may be due some measure of deference.

Review of an agency's interpretation of the statute it administers is typically a two-step process. First, the court must consider whether "Congress has directly spoken to the issue."[76] "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[77] If the court determines that the statute is in this respect ambiguous, then the court must determine the appropriate degree of deference given the nature of the agency interpretation and evaluate the interpretation in that light.[78] Where, as here, the "policy" in question is, even if in form only, a "policy statement," this court owes the Department's interpretation some, but only some, deference.[79] The court finds that Ms. Ferguson is substantially likely to prevail on her claim that the interpretation by

74. As noted above, though the OLC Memo addresses only Class C and Class D felons, the Bureau policy and its rationale would, at least theoretically, apply equally to Class B felons.

75. 18 U.S.C. § 4001. The court notes that the Supreme Court has approved the Bureau as an interpreter of portions of the statute it administers. *See Reno v. Koray,* 515 U.S. 50, 60, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995) (approving the Bureau as the proper agency to interpret the Bail Reform Act).

76. *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

77. *Id.* at 842–43, 104 S.Ct. 2778.

78. *Id.* at 843, 104 S.Ct. 2778.

79. *See Koray,* 515 U.S. at 60, 115 S.Ct. 2021 ("But BOP's internal agency guideline, which is akin to an 'interpretive rule' that 'do[es] not require notice and comment is still entitled to some deference, since it is a permissible construction of the statute' ") (internal citations omitted).

the Department of Justice and the Bureau is inconsistent with the plain meaning of 18 U.S.C. § 3621.

The court looks first to the language of the statute that purports to give the Bureau some measure of discretion:

(a) A person who has been sentenced to a term of imprisonment ... shall be committed to the custody of the Bureau of Prisons. [ ... ]

(b) The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability.[80]

It could not be clearer from this language that the Congress grants the Bureau a broad discretion to appoint the places where prisoners will serve their terms of imprisonment.

Subsection 3621(a) directs that people who must serve terms of imprisonment be given over to the custody of the Bureau. The first sentence of subsection 3621(b) uses mandatory language to create a duty in the Bureau to do something with the prisoners in their custody, namely place them. The second sentence of this subsection uses language of empowerment which tells the Bureau where it may place such prisoners. According to that second sentence, the Bureau's discretion extends to "any available penal or correctional facility." Thus, the statute commits certain people to the custody of the Bureau, directs that the Bureau do something to place people so committed, and grants the Bureau the authority to choose the place of imprisonment from among available penal or correctional institutions.

In this language, there is, no suggestion of any limitation on the Bureau's authority except that the facility chosen must (1) be a "penal or correctional facility"; and, (2) meet "minimum standards of health and habitability established by the Bureau." There is no controversy over this later limitation on the Bureau's imprisonment power. Hence, the only apparent limitation on the Bureau is that it choose a place that is a "penal or correctional facility."[81]

So the question the court faces would appear to have evolved into the question whether community confinement centers are penal or correctional institutions. If they are, the statute plainly says that the Bureau may commit people sentenced to terms of imprisonment to them. On the direction and assurances of higher courts than this, the court will consider, for guidance, definitions of the terms "penal" and "correctional" to decipher what meaning to impute to those terms in the statute. It is becomes obvious, without going far, that a community corrections center is a penal or correctional institution.

According to the *Oxford English Dictionary*, something is properly characterized as "penal" if it is:

1. Of, pertaining to, or relating to punishment. (a.) Having as its object the infliction of punishment, punitive; prescribing or enacting the punishment to be inflicted for an offence or transgression...(c.) Having the nature or character of punishment; constituting punishment; inflicted as, or in the way of, punishment...(e.) Used or appointed as a place of punishment. (f.) Involving, connected with, or characterized by, a penalty or legal punishment. (g.) Of, pertaining to, or subject to the penal laws, penal servitude, etc.[82]

---

**80.** 18 U.S.C. § 3621(a) & (b).

**81.** There are other apparent limitations in § 3621(b) that the court will discuss later. None of these are proposed as evidence that

the Bureau lacks discretion to make direct CCC designations.

**82.** OXFORD ENGLISH DICTIONARY. (J.A. Simpson and E.S.C. Weiner.2d ed., 1989). Viewed at

Dictionary wars being what they are in the courts today, some would perhaps prefer the perspective of an American source. According to the *American Heritage Dictionary*, 4th ed., "penal" means:

> Of, relating to, or prescribing punishment, as for breaking the law. Subject to punishment; legally punishable: *a penal offense.* Serving as or constituting a means or place of punishment.[83]

As either of these common definitions demonstrate, a penal facility is a facility to which people are committed as a form of punishment.

Meanwhile, to be "correctional" is defined somewhat unhelpfully by the *Oxford English Dictionary* as "[o]f or pertaining to correction; corrective."[84] More helpfully, the *American Heritage Dictionary* tells us that, in the appropriate context, "correctional" means: "[p]unishment intended to rehabilitate or improve."[85] Thus, the court is again faced with a basic matter, namely whether CCCs are facilities that serve the purpose of punishing, correcting, or rehabilitating prisoners. If they do, then it is apparently within the Bureau's authority to make direct commitments to them.

After reflection and review on this matter, the court finds that CCCs are facilities for the purpose of punishment, rehabilitation, or correction. Indeed, the court cannot imagine what other purpose these facilities might reasonably serve. This finding is consistent with the Bureau's own understanding of the function and purposes of CCCs.[86] In fact, even the Sentencing Commission has expressed the view that CCCs are punitive in a joint report issued with the Bureau:

> Community correction centers (CCC) provide two program components within their facilities: a pre-release component and a community corrections component. [ . . . ] The community corrections component is designed to be sufficiently punitive to be a legitimate sanction.[87]

Moreover, the *Prison Litigation Reform Act,* relied upon by the Government to argue that Ms. Ferguson cannot bring her claim because she has not exhausted her administrative remedies, applies its exhaustion standard to "any jail, prison, or other correctional facility."[88] And, the Tenth Circuit has interpreted the phrase "correctional facility" to apply to the Colorado state counterpart to CCCs and thus to require that inmates in community correction centers exhaust their administrative remedies before bringing suit.[89] Thus, it appears quite compelling that the Bureau has the discretion to make direct commitments to CCCs.

Despite this apparently clear statutory grant of authority, the Government now informs the court that the Bureau's discretion is in fact limited. According to the Government, the Bureau can no more com-

---

OED Online, *available at* <http://www.oed.com> (visited Feb. 19, 2003).

**83.** THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, (Houghton Mifflin Co. 4th Ed.2000).

**84.** OXFORD ENGLISH DICTIONARY, *supra* note 82.

**85.** THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, *supra* note 83.

**86.** *See, e.g.,* Program Statement No. 7310.01 (deeming CCCs "penal or correctional" facilities).

**87.** Joint Report to Congress, United States Sentencing Commission and Federal Bureau of Prisons, *Maximum Utilization of Prisons Resources*, at 9–10 (June 30, 1994).

**88.** 42 U.S.C. § 1997e(a).

**89.** *Dmytryszyn v. Hickox*, 172 F.3d 62, 1999 WL 59622 (10th Cir.1999)(unpublished disposition).

mit a person in its custody to a CCC than it could commit her to a turn on a merry-go-round. The reason, the Government opines, is that neither of these locations is a "place of imprisonment." This language, the Government argues, collapses the Bureau's discretionary powers before it ever comes time to decide among penal or correctional institutions. Therefore, under the Government's interpretation of the statutory language: (1) the courts send the Bureau people sentenced to terms of imprisonment;[90] (2) the Bureau must place them in places of imprisonment;[91] and, (3) the Bureau may choose the places of imprisonment from among the set of available penal or correctional facilities that qualify as places of imprisonment.[92]

There are several difficulties with this argument. In the first instance, it is deeply counterintuitive that the phrase "place of imprisonment" is meant to be a limitation upon what everyone acknowledges to be the much broader phrase "penal or correctional institution." And the statute does not simply speak of "penal or correctional" facilities; it speaks of *any* penal or correctional facility. Imagine a mother calling her child and saying, "On the way home, go to the store and pick up some Coke.[93] You can pick up any kind of soda you like." If on returning home the mother became angry at her child for picking up Mr. Pibb ™, everyone would properly regard the mother as irrational. If she really meant "Coca–Cola ™" by "Coke" as opposed to something more generic or general, then she would not have given her child the apparent discretion to choose any "soda" she liked. The general term in the second sentence only makes sense if the seemingly specific term in the first sen-

tence had a broader meaning than might otherwise be apparent. This is why the Government's interpretation through the OLC Memo is implausible.

According to the OLC Memo, Congress has told the Bureau: "Whenever the courts send you an inmate, put her in a prison or jail. You are free to choose from all the prisons, jails, and community confinement centers." The only sensible way to understand the interplay between the phrases "place of imprisonment" and "any penal or correctional facility" is to read the latter as giving content to the former, just as the phrase "any soda" gives content to the term "Coke" in the example above. Thus, what Congress has expressed to the Bureau is the following: "You must place inmates sent to you into some place of imprisonment. By that we mean, place them into a penal or correctional facility; you choose which one." So long as community confinement centers are viewed as penal or correctional facilities, they would also be places of imprisonment under the statute.

Moreover, the court finds that community confinement centers are "places of imprisonment" as that phrase is most naturally understood. The *American Heritage Dictionary* defines "imprisonment" as "[t]o put in or as if in prison; confine." The *Oxford English Dictionary* defines "imprisonment" as "[t]he action of imprisoning, or fact or condition of being imprisoned; detention in a prison or place of confinement; close or irksome confinement; 'forcible restraint within bounds'; incarceration." Placement in a CCC allows an inmate to leave the center for the purpose of employment, but otherwise re-

---

**90.** *See* 18 U.S.C. § 3621(a).

**91.** 18 U.S.C. § 3621(b).

**92.** 18 U.S.C. § 3621(b).

**93.** It is very common for persons who reside in the southeastern portions of the United States to refer to all kinds of soda-pop as simply "Coke," in the same way that persons from other regions use more generic terms such as "soda-pop," "soda," or just "pop."

quires the inmate to be in the center. As the joint report by the Sentencing Commission and the Bureau point out, "[e]xcept for employment and other required activities, offenders in the CCC component must remain in the facility at all times." [94]

The parties to this case have stipulated that Ms. Ferguson "travels to her job, caring for her two grandchildren from 7:00 a.m. to 6:00 p.m., Monday through Friday" and receives "one three hour pass to attend a religious service weekly," but is otherwise confined to the Ecumenical House.[95] This qualifies as confinement. While community confinement centers no doubt are less confining than prisons or jails, they nevertheless impose heavily on the freedom of the inmates to come and go as they choose. The inmates do not return to their homes. They do not set their own schedules. They are confined for all practical purposes and under the control of the government through its agents. The *degree* of confinement is not determinative of the *whether* these inmates are confined.[96] Therefore, the court cannot escape the conclusions that a term served in a CCC is a term of confinement and that a term of confinement is a term of imprisonment, as used in 18 U.S.C. § 3621.

Attention to the larger statutory context confirms this view. Section 3551 authorizes only three categories of sentence: (1) terms of probation, (2) fines, and (3) terms of imprisonment.[97] Subsection 3551(b) provides:

> An individual found guilty of an offense shall be sentenced, in accordance with the provisions of section 3553, to—
>
> (1) a term of probation as authorized by subchapter B;

(2) a fine as authorized by subchapter C; or

(3) a term of imprisonment as authorized by subchapter D.

Of these three kinds of sentences, community confinement clearly falls into the last category. Community confinement clearly is not a fine. Nor is it a form of probation. Under a term of probation a convict is essentially free to come and go as she chooses. Community confinement center inmates live at these facilities. They may be free to hold jobs in the community, but they are not merely on supervised release. If community confinement is a valid form of sentence, it is a form of imprisonment under the statute.

It does not matter that the federal district courts are constrained to a greater degree than the Bureau. Though courts have an institutional incentive to recognize the greatest scope for judicial authority, they also have an institutional duty to allow that other institutions surpass them when the law so requires. The court also finds that the Bureau has greater authority to assign prisoners to CCCs than the court itself does. It is the job of the court, under the statutory scheme, to impose sentences. It is the job of the Bureau to decide where those sentences are to be served.

It is for this reason that the court finds the bulk of the reasoning of the OLC Memo to be a series of *non sequiturs*. For that document relies on a misconception of the authority of the Sentencing Commission ("Commission"). The Commission clearly has the statutory authority to limit the discretion of the federal district courts in sentencing matters. And,

---

**94.** Joint Report, *supra* note 87 at 10.

**95.** Stipulated Facts, Docket No. 24.

**96.** As Blackstone wrote, "Every confinement of the person is an imprisonment, whether it be in a common prison, or a private house, or even by forcibly detaining one in the public streets."

**97.** 18 U.S.C. § 3551(b).

the federal district courts are explicitly directed to conform their sentences to the Sentencing Commission Guidelines.[98] But, the Commission's authority does not touch that of the Bureau and the Bureau's discretion is nowhere hemmed in by the Guidelines.

This is because the Commission's enabling statute gives it authority only over the sentencing of the courts, not the decisions of the Bureau. Section 994(a) calls on the Commission to "promulgate and distribute to all courts of the United States and to the United States Probation System—(1) guidelines, as described in this section, for *use of a sentencing court* in determining the sentence to be imposed in a criminal case, including" whether to impose a sentence of imprisonment, probation, or a fine, the appropriate quantum of such punishment, whether to include a term of supervised release, and whether terms will run consecutively or concurrently.[99] Nowhere does the Commission's enabling statute even mention *places* of imprisonment or the statutory section that purports to give the Bureau its authority. In fact, section 994 makes no mention of authority over the Bureau at all. The only reference to the Bureau in that section is as a partner.[100] Indeed, it is evident from the statute that the Sentencing Commission has authority over sentencing while the Bureau has authority over carrying sentences out. Hence, the court concludes that the Commission has no authority over placement matters and that its Guidelines are not binding on the Bureau.

Yet, the Government relies for its interpretation of "imprisonment" in 18 U.S.C. § 3621 largely on the way that the Commission has used the terms "imprisonment" and "community confinement" in promulgating the Guidelines. The Government is specifically concerned that there be some measure of consistency between the language of Guideline § 5C1.1 and 18 U.S.C. § 3621. Subsection (d) of that Guideline provides:

> If the applicable guideline range is in Zone C of the Sentencing Table, the minimum term may be satisfied by—
>
> (1) a sentence of imprisonment; or
>
> (2) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention according to the schedule in subsection (e), provided that at least one-half of the minimum term is satisfied by imprisonment.[101]

It is evident, the Government argues, that the Sentencing Commission does not regard placement in a community confinement center as "imprisonment." Otherwise, it would not allow placement in a CCC, only then to require that at least half of each term be satisfied by "imprisonment." If a CCC term were a term of imprisonment, there would be no need for this caveat. Thus, the Government concludes, service of a sentence in a CCC is not "imprisonment" under the Guidelines.

As an initial matter, the court believes that the Government's interpretation is mistaken. The court reads the Guidelines

---

**98.** 18 U.S.C. § 3553(c) ("The court *shall* impose a sentence of the kind, and within the range, referred to in subsection (a)(4) [referring to the kinds of sentence and sentencing range established by the Sentencing Commission] unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission").

**99.** 28 U.S.C. § 994(a)(emphasis added).

**100.** 28 U.S.C. § 994(q)("The Commission and the Bureau of Prisons shall submit to Congress an analysis and recommendations concerning maximum utilization of resources to deal effectively with the Federal prison population.").

**101.** U.S. Sentencing Guideline § 5C1.1(d).

to treat community confinement as a subclass of imprisonment. When a court under Guideline § 5C1.1(d) decides it is appropriate to split the sentence of a person convicted of a Zone C felony, that Guideline actually allows the court to substitute a lesser for greater form of confinement. The Guidelines' commentary is helpful on this point.

> For example, where the guideline range is 8–14 months, a sentence of four months imprisonment followed by a term of supervised release with a condition requiring four months community confinement or home detention would satisfy the minimum term of imprisonment required by the guideline range.[102]

Thus, where the Guideline table requires a minimum *term of imprisonment,* the Guidelines allow the federal courts to satisfy it by *either* service of the sentence in a full service prison *or* in a community confinement center.

While the Guidelines do recognize that community confinement is distinct from imprisonment, the more natural reading is that community confinement is a form of imprisonment rather than a distinct classification of punishment. The Guidelines say that a court may impose a "sentence of imprisonment that *includes* a term of supervised release with a condition that substitutes community confinement." This language suggests that community confinement is part of the term of imprisonment. For the overall term is supposed to be a term of imprisonment and the Guidelines allow the courts to impose for half that term, a term of supervised release.

But, the courts only may avail themselves of this option if they require that term of supervised release to be served in a community confinement center or by home confinement. Therefore, if one views a term in a community confinement center as a term of imprisonment, then the Guidelines are actually *requiring* courts to place these felons in places of imprisonment for their entire terms of imprisonment. So, while the courts may determine that half of such a split sentence be served in a particular CCC, they still must commit them to the Bureau for assignment of the other half of their terms of imprisonment. Under the reading adopted by this court—and by the rest of the world before December, 2002—the Bureau would then have the discretion to place such prisoners into either prisons, jails, or community confinement centers for the first half of their sentences.

In any event, the court need not find that the Sentencing Commission regards community confinement as a form of imprisonment to decide that the Government's interpretation based on the OLC Memo is impermissible, for the Sentencing Commission does not have any authority over the Bureau. Even if the Sentencing Commission was steadfastly committed to the distinction between community confinement and imprisonment, that fact would not affect the discretion of the Bureau under 18 U.S.C. § 3621 because the Commission lacks the requisite authority.

The second source of authority proposed by the Government for its interpretation of 18 U.S.C. § 3621 are several judicial opinions interpreting the terms "imprisonment" and "community confinement" in the Sentencing Guidelines.[103] These cita-

---

**102.** U.S. SENTENCING GUIDELINE § 5C1.1, Application Note 4.

**103.** *See Serafini,* 233 F.3d at 777("It is true that *under section § 5C1.1* of the Guidelines, "community confinement" cannot constitute

"imprisonment" for purposes of fulfilling the requirement that one-half of a split sentence be satisfied by imprisonment"); *Adler,* 52 F.3d at 21 ("We agree with the government that the district court's *interpretation of Sections 5C2.1(d) and (e)* is erroneous."); *Swigert,*

tions are inapt for the same reason. If the Sentencing Commission has no authority to constrain the Bureau, then judicial opinions interpreting the meaning of the Guidelines as they apply to the courts are irrelevant. These opinions address the question whether "community confinement" is "imprisonment" within the meaning of the Guidelines. It is a separate question whether community confinement is a form of imprisonment under a statute that fleshes out the concept of "place of imprisonment" by using the term "any penal or correctional facility." Hence, the OLC, and subsequently, the Government, were mistaken to rely so heavily for their interpretation on these decisions.

The final source of authority relied on by the Government is 18 U.S.C. § 3624(c), which concerns pre-release custody. According to the OLC Memo, that section specifically constrains the Bureau's discretion to place inmates directly into community confinement centers. In fact, both the OLC and Government conclude that the section demands that the Bureau never place anyone sentenced to a term of imprisonment of any kind to a CCC for more than ten percent of her term of imprisonment and, even then, never for more than six months. The statute reads:

> The Bureau of Prisons shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last 10 percentum of the term to be served under the conditions that will afford the prisoner a reasonable

opportunity to adjust to and prepare for the prisoner's re-entry into the community. The authority provided by this subsection may be used to place a prisoner in home confinement.[104]

This portion of the Government's rationale is almost worth preserving for the marvelous irony it foists upon the world. As the court reads this subsection, Congress is directing the Bureau to do its level best to assure that everyone who has served time get a decent opportunity to go through a period of readjustment before being thrust back into the community.

Yet, the Government would have the court read this section as a stiff curb on the Bureau's ability to make such placements at all. The court finds this reading to be implausible. The statute clearly emphasizes the Bureau's duty to *ensure* a reasonable opportunity for a period of adjustment. It aims to relieve the burdens of direct release on our communities, the inmates, and their families. This section does not shrink the discretion granted the Bureau in 18 U.S.C. § 3621(b). Instead, it creates an obligation in the Bureau to consider alternative means of incarceration for limited periods that will facilitate the goal of seamless and permanent re-entry. This reading tracks precisely the one adopted by the Tenth Circuit. "[O]ur interpretation of § 3624(c) as a legislative directive focusing on the development of conditions to facilitate the inmate's adjustment to free society, whatever the institution of pre-release confinement, accepts as a premise that the broader statutory scheme concerning the Bureau's general placement authority remains intact and effective."[105]

---

18 F.3d at 445 (*"Section 5C1.1 plainly draws a distinction* between 'imprisonment' and either community confinement or home detention"); *Jalili*, 925 F.2d at 892 ("[W]e *read Guideline § 5C1.1(d)*, which states that 'the minimum term may be satisfied by (1) a sentence of imprisonment; or (2) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention

according to the schedule of § 5C1.1(3),' to mean that community confinement may be included as a condition during the term of supervised release") (emphases added).

**104.** 18 U.S.C. § 3624(c).

**105.** *Prows v. Federal Bureau of Prisons*, 981 F.2d 466, 470 (10th Cir.1992); *see also U.S. v.*

The remaining subsections of 18 U.S.C. § 3624 reinforce this view. Subsection (a) directs the Bureau with respect to releasing inmates. Subsection (b) directs, among other things, that Bureau provide a General Educational Development program for inmates who have not previously completed their high school educations. Subsection (d) directs the Bureau to provide released inmates with money, clothing, and transportation to ease re-entry. Finally, subsection (f) directs the Attorney General to direct the Bureau of Prisons to adopt a mandatory functional literacy program. All of these requirements evidently are directed at the same goal: advancing rehabilitation to destroy recidivism. It makes absolutely no sense within this context to read subsection (b) as an unyielding tool of retribution.

The court also notes that the former Bureau practice is an extremely long standing one. The provisions that 18 U.S.C. § 3621 replaced were former 18 U.S.C. § 4082(a) & (b), which provided:

(a) A person convicted of an offense against the United States shall be committed, for such term of imprisonment as the court may direct, to the custody of the Attorney General of the United States, who shall designate the place of confinement where the sentence shall be served.

(b) The Attorney General may designate as a place of confinement any available, suitable, and appropriate institution or facility, whether maintained by the Federal Government or otherwise, and whether within or without the judicial district in which the person was convicted, and may at any time transfer a person from one place of confinement to another.[106]

These provision had their origin in a law first passed in 1930.[107] By all accounts, the change proposed by the Government, a change it infers from minor statutory changes and collateral agency rulemaking, would alter a sentencing landscape that existed long before the Sentencing Guidelines hit the scene. The parties have not yet had the opportunity to present any detailed history of sentencing practices before 1987 because of the expedited nature of these proceedings. The court is persuaded, however, that given the opportunity to do so at a hearing for a permanent injunction, Ms. Ferguson will be able to cement her position by providing such information. In any event, no one contests that the proposed change fundamentally alters the handling of certain classes of criminal convict. As discussed previously, the Bureau itself has long held that it had the authority to make direct designations to CCCs.

Moreover, the court's interpretation of the statute is further confirmed by the legislative history. The Senate Report indicates that 18 U.S.C. § 3621(b) follows the already existing practices of the Bureau. Specifically the report reads:

Proposed 18 U.S.C. 3621(b) follows existing law in providing that the authority to designate the place of confinement for Federal prisoners rests in the Bureau of Prisons. The designated penal or correctional facility need not be in the judicial district in which the prisoner was convicted and need not be maintained by the Federal Government. Existing law provides that the Bureau may designate

---

*Morales–Morales*, 985 F.Supp. 229, 231 (D.P.R.1997).

**106.** *See Gale v. Dep't of Justice*, 628 F.2d 224, 229 (D.C.Cir.1980).

**107.** Act of May 14, 1930, Pub.L. No. 71–218, 46 Stat. 325.

a place of confinement that is available, appropriate, and suitable. Section 3621(b) continues that discretionary authority with a new requirement that the facility meet minimum standards of health and habitability established by the Bureau of Prisons.[108]

Three things are worth emphasizing from this passage. First, the committee report did not purport to change then-existing practices, but instead emphasized that the statute preserved them. Second, the report exchanges the term "place of confinement" for the term "place of imprisonment" when discussing the discretion of the Bureau. And it does so twice. Third, the passage emphasizes the breadth of the Bureau's discretion and specifically notes where the new law will limit its existing discretion. This new restriction is that the place of confinement be habitable.

The apparent lesson from this background information is twofold: (1) the policy challenged by the OLC memo is not merely a policy of fifteen years standing under the Comprehensive Crime Control Act of 1984, it is a policy that predates that Act and has been with us for some half a century; and, (2) far from explicitly overriding that known policy—as of course it was then and remains today within the power of Congress to do—the Crime Control Act of 1984 left that policy in place by leaving the statutory language untouched. If Congress had wanted to remove the discretion the Government now attempts to remove from it by relying on the OLC Memo, it could have done so. But Congress did not, as is evident from the commentary to the bill, as well as from the face of the statute itself.

## III. Section 2241 Claims

In evaluating Ms. Ferguson's claims under 28 U.S.C. § 2241 as having a substantial likelihood of success warranting a grant of a preliminary injunction, the court must first determine whether she has alleged either a federal constitutional or statutory wrong sufficient to make the manner of her incarceration resulting from the new "policy" unlawful.[109] Under the Fifth Circuit's analysis in *Brown*, it seems rather likely that she has asserted the loss of a vested "privilege" rather than the mere expectation of a "privilege" due to the new Bureau "policy." [110] Therefore, it is not unreasonable for the court to conclude that she was entitled to some degree of procedural due process protection.[111]

In this case, however, it is blatantly apparent that she received none. Not only was this "policy" change enacted by the stroke of a bureaucratic pen in the waning days of 2002 without any indication that it might occur,[112] there is also a colorable argument that the Bureau should have followed the notice and comment procedures of the APA in enacting a rule by enacting a "policy" that is completely binding. Alternatively, the Bureau ought to have followed the APA notice and comment procedures in issuing an "interpreta-

---

108. S. Rep. No. 98–225, at 141–42 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3183, 3324.

109. *See Brown*, 528 F.2d at 1052–53.

110. *Id.* at 1053.

111. *Id.*

112. The court rejects the Government's position that this change was "foreseeable," because the court has already concluded that the "interpretation" of the term imprison-

ment as proposed by the OLC and the Bureau is not permissible because it is just plain wrong. It is never foreseeable that an administrative agency will misinterpret its own statute to this degree. Moreover, there has been no evidence presented that the prior interpretation of the word imprisonment had ever been challenged for the purposes of the Bureau exercising its discretion to commit a federal convict directly to a CCC.

tion" that departed from a longstanding agency practice.[113]

To begin with, generally, "a binding policy is an oxymoron."[114] It is well established that policies that bind are in fact, rules.[115] In order to be valid, most rules must be enacted in the manner contemplated by the APA.[116] It is uncontested in this case that the Bureau did not undertake any notice and comment procedures in enacting what is in effect a new rule with regard to direct commitments to CCCs. Additionally, the court has already found that Bureau's "interpretation" to be invalid as a matter of law.

Moreover, nowhere has the Government indicated that the Bureau has the authority to issue rules with retroactive effect. Such authority is required[117] in a case such as this where the Bureau wishes to redesignate an inmate such as Ms. Ferguson and elevate the level of her incarceration through no fault of her own. This is not merely a "secondary" retroactive effect as the Government suggests. Ms. Ferguson was designated to serve her term in the Ecumenical House by the Bureau, and the Bureau now seeks to revoke that designation with only a few months left in her term.

Whether or not a cognizable ex post facto claim could be made out in a case such as this is not entirely clear due to the expedited nature of these proceedings. The court notes that, not only has another district court concluded somewhat persua-sively there is a viable ex post facto claim under these circumstances,[118] courts considering revocations of parole have ruled on that ground as well.[119] It is illogical for the Government to argue that her conditions of imprisonment would not be made objectively worse upon redesignation and then argue that confinement in a CCC is not imprisonment. Simply put, "[r]etroactivity is not favored in the law."[120] However, despite Ms. Ferguson's strong showing of a likelihood of success on the merits of her section 2241 claims, a ruling on this issue is unnecessary because the court has already concluded that a preliminary injunction should be granted on her civil claims asserted under the APA.

## IV. Section 2255 Claims

With regard to Ms. Ferguson's claims under 28 U.S.C. § 2255, the court is not confident that it could find that she would be substantially likely to prevail on the merits. This case is not significantly distinguishable from other recent cases addressing this very same issue on a key ground. While this court surely would have wanted to impose a lesser or different sentence if it knew that the Bureau would change its interpretation of the word "imprisonment" as it relates to CCCs during Ms. Ferguson's term of incarceration, it couldn't have. She received the lowest possible sentence under the applicable Guidelines for Zone D offenders. There were no § 5K1.1 motions requesting this

---

**113.** *See Shell Offshore,* 238 F.3d at 630.

**114.** *See Vietnam Veterans v. Secretary of the Navy,* 843 F.2d 528, 537 (D.C.Cir.1988).

**115.** The APA defines the term "rule" as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law...." *See* 5 U.S.C. § 551(4).

**116.** *See Shell Offshore* at 627 (citing 5 U.S.C. § 551(5)).

**117.** *See Bowen v. Hood,* 202 F.3d 1211, 1220–21 (9th Cir.2000); *Cort v. Crabtree,* 113 F.3d 1081, 1084 (9th Cir.1997).

**118.** *Ashkenazi v. Ashcroft,* 246 F.Supp.2d 1 (D.D.C.2003).

**119.** *See Brown* 528 F.2d. at 1053.

**120.** *See Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 209 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (internal citations omitted).

**576**

court to depart downward from the applicable Sentencing Guidelines. Thus, it is highly unlikely that these case specific circumstances would have enabled Ms. Ferguson to serve her entire term of imprisonment in a CCC.[121]

However, despite the lack of the court's confidence on the merits of Ms. Ferguson's section 2255 claims, a definitive ruling is unnecessary because the court has already found that a preliminary injunction is warranted on her APA claims.

## CONCLUSION

Accordingly, Ms. Ferguson's motion for a preliminary injunction (doc.3–civil case) is GRANTED. The Bureau of Prisons, and its leadership in the persons of United States Attorney General John Ashcroft, Bureau Director Kathleen Hawk Sawyer, the Bureau's Regional Director for the South Central Region, Ronald G. Thompson, and Tracy Ennen, their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them are hereby enjoined from transferring Ms. Ferguson from the Ecumenical House until such time as the court issues a final ruling on the merits of this case.

---

**121.** *See, e.g., Culter v. U.S.,* 241 F.Supp.2d 19, 21–22 (D.D.C.2003) (altering sentence because such alteration was permissible under case facts); *U.S.* v. *James,* 244 F.Supp.2d 817 (E.D.Mich.2003)(refusing to alter sentence because imprisonment was required under case facts); *Herron,* 2003 U.S. Dist. LEXIS 1932 (same).