Celestine SMITH, Petitioner,

v.

UNITED STATES of America, Respondent.

No. CIV.A. 03–0464(RMU).

No. CR.A. 01–0263–02(RMU).

United States District Court, District of Columbia.

Aug. 19, 2003.

**MEMORANDUM OPINION**

DENYING THE PETITIONER'S MOTION FOR RE-
LIEF UNDER 28 U.S.C. § 2255; DISMISS-
ING WITHOUT PREJUDICE THE PETITION-
ER'S MOTION FOR RELIEF UNDER 28
U.S.C. § 2241; CONTINUING THE STAY
ON THE EXECUTION OF THE PETITIONER'S
PRISON SENTENCE

URBINA, District Judge.

## I. INTRODUCTION

This matter comes before the court on the petitioner's motion to vacate, set aside, or correct her sentence. The petitioner expected to serve the custodial component of her sentence in a community corrections center ("CCC"). Pursuant to a new sentencing policy enunciated after this court sentenced her, however, the Bureau of Prisons ("BOP") in conjunction with the Department of Justice ("DOJ") abandoned the petitioner's CCC placement so that instead she serves her sentence in a federal prison camp located in Alderson, West Virginia. The petitioner appears to argue that the subsequent alteration of her CCC term violates due process and principles of equitable estoppel, basing these challenges on 28 U.S.C. §§ 2241 and 2255, and the reasoning advanced in *Culter v. United States*, 241 F.Supp.2d 19 (D.D.C.2003) (Huvelle, J.). The court dismisses the petitioner's section 2241 motion without prejudice because the petitioner has failed to name her custodian as a respondent in this action. Although there is a colorable argument that the alteration of the petitioner's CCC term is unfair, the court denies the petitioner's section 2255 motion for failing to sustain her contentions by a preponderance of the evidence and because the government may lawfully substitute prison for the petitioner's originally designated CCC term. Given the adverse effects of the shift in policy, however, the court allows the execution of the petitioner's prison sentence to remain stayed for a reasonable period of time so as to provide the petitioner with an opportunity to make the necessary preparations for her prison term. In addition, if the petitioner so desires, the court will recommend that the BOP designate the petitioner to a prison that is closer to her home and family.

## II. BACKGROUND

For purposes of the instant motion, the record of this case begins on October 1,

2001 when the petitioner and her husband pled guilty to conspiracy to commit mail fraud pursuant to a plea agreement with the government. Gov't's Opp'n at 1–2; Plea Agreement at 2; Presentence Investigation Report ("PSR") at 3. The PSR placed the petitioner within Zone C of the Sentencing Table for the U.S. Sentencing Guidelines, resulting in a 10–16 month sentencing range for her custodial term. Gov't's Opp'n at 2; PSR at 13.

On November 5, 2002, the court sentenced both the petitioner and her husband to five months of imprisonment, with a recommendation to the BOP that they serve their period of confinement in a CCC. Tr. dated Nov. 5, 2002, at 11. In addition, the court sentenced each of them to five months of home detention upon the completion of their period of confinement, and ordered them to pay restitution to their defrauded victims. *Id.* at 11–12.

Because the petitioner and her husband have two young children, the court, upon the parties' joint recommendation, staggered their sentences so that one parent could remain with the children while the other served his or her term of confinement. *Id.* at 2–5, 10; *see also* Tr. dated Oct. 1, 2001, at 19–21. The petitioner's husband served his term without incident and was released on March 29, 2003 to begin the home-detention component of his sentence. Probation Mem. dated Apr. 22, 2003. The petitioner was to begin serving her term on April 1, 2003 at a local CCC. Order to Surrender dated Dec. 9, 2003.

Then suddenly, before the petitioner was to begin her term at the CCC, a governmental policy shift transformed criminal sentencing as it relates to prisoner placement. On December 13, 2002, the DOJ's Office of Legal Counsel ("OLC") issued a memorandum ("OLC Memorandum") interpreting the BOP's then-current policy of adhering to a sentencing judge's recommendation to place a non-violent offender who received a short prison sentence into a CCC. OLC Mem. at 1. The OLC Memorandum concluded that the courts have no authority to substitute a CCC term for imprisonment because, in essence, "imprisonment" means time spent in "prison" and not in a CCC. *Id.* at 3–4. The OLC Memorandum further concluded that the BOP does not have the authority to impose a CCC term for imprisonment, either on its own initiative or in deference to a sentencing judge's recommendation. *Id.* at 6–8. According to the OLC Memorandum, the BOP's statutory authority to select the "*place* of imprisonment" does not include the authority to designate a CCC as the place of imprisonment based on the same rationale that confinement in a CCC does not equate to imprisonment. *Id.* at 6 (emphasis in original).

On December 16, 2002, DOJ issued a memorandum ("DOJ Memorandum") accepting the OLC's recommendation and directing the BOP to comply with this interpretation of the law both prospectively (by no longer allowing CCC terms if the Sentencing Guidelines mandate "imprisonment") and retroactively (by transferring to prison all federal inmates currently housed in a CCC who have at least 150 days remaining on the imprisonment component of their sentence).[1] DOJ Mem. at

---

1. The new DOJ policy provides that

 BOP immediately should take all steps necessary to ensure that its sentencing placement decisions are in full compliance with the governing law[, i.e., the OLC's finding that the BOP's former policy was "unlawful"]. In addition, BOP should transfer to an actual prison facility all federal offenders currently residing in a CCC who, as of [December 16, 2002], have more than 150 days remaining on the imprisonment component of their sentence.

 DOJ Mem. at 1.

1. The petitioner falls into the category of offenders ensnared by the retroactive application of the new DOJ policy because: (1) her "imprisonment" term under the U.S. Sentencing Guidelines is 10–16 months; (2) she was to serve a portion of her "imprisonment" term in a CCC; and (3) she had at least 150 days remaining on the CCC-imprisonment portion of her sentence as of the December 16, 2002 date of the DOJ Memorandum. *Id.* Accordingly, the BOP notified the court that it would not follow the court's recommendation and had thereby designated the petitioner to a federal prison camp in Alderson, West Virginia. BOP Letter dated Jan. 17, 2003.

On January 31, 2003, the petitioner filed a motion to vacate, set aside, or correct her sentence pursuant to 28 U.S.C. §§ 2241 and 2255, arguing that principles of due process and equitable estoppel preclude the BOP from sending her to prison instead of the originally designated CCC.[2] Pet'r Mot. On March 26, 2003, the court stayed the execution of the petitioner's sentence, which the BOP had scheduled to commence on April 1, 2003, pending resolution of the petitioner's motion. Order dated Mar. 26, 2003. The court now addresses the petitioner's motion.

### III. ANALYSIS

#### A. Legal Standards

##### 1. Legal Standard for Relief Under 28 U.S.C. § 2255

■■■ A petitioner may challenge the validity of his imposed sentence under 28 U.S.C. § 2255. *Gomori v. Arnold,* 533 F.2d 871, 875 (3rd Cir.1976) (stating that a challenge to an imposed federal sentence must be made under section 2255,

while a challenge to a sentence executed by federal prison and parole authorities is properly made under section 2241). Section 2255 authorizes the sentencing court to discharge or resentence a prisoner if the court concludes that it was without jurisdiction to impose the sentence, the sentence was in excess of the maximum authorized by law, or the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255; *United States v. Addonizio,* 442 U.S. 178, 185, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979) (citing *United States v. Hayman,* 342 U.S. 205, 216–17, 72 S.Ct. 263, 96 L.Ed. 232 (1952)). A petitioner can collaterally attack his sentence under section 2255 where the sentencing judge made an "objectively ascertainable error." *King v. Hoke,* 825 F.2d 720, 724–25 (2d Cir.1987) (citing *Addonizio,* 442 U.S. at 187, 99 S.Ct. 2235). Nevertheless, the petitioner seeking to vacate his sentence shoulders the burden of sustaining his contentions by a preponderance of the evidence. *United States v. Simpson,* 475 F.2d 934, 935 (D.C.Cir.1973); *Wright v. United States,* 624 F.2d 557, 558 (5th Cir. 1980); *United States v. DiCarlo,* 575 F.2d 952, 954 (1st Cir.1978); *Crail v. United States,* 430 F.2d 459, 460 (10th Cir.1970); *Miller v. United States,* 261 F.2d 546, 547 (4th Cir.1958). Relief under section 2255 is an extraordinary remedy. *Addonizio,* 442 U.S. at 184, 99 S.Ct. 2235; *United States v. Pollard,* 959 F.2d 1011, 1020 (D.C.Cir.1992); *United States v. Hodges,* 156 F.Supp. 313, 314 (D.D.C.1957) (Sirica, J.).

##### 2. Legal Standard for Relief Under 28 U.S.C. § 2241

■■■ Prisoners may attack the manner of execution of a federal sentence pursuant

---

**2.** The court had no small amount of difficulty divining the petitioner's arguments because instead of filing a well-argued brief in support of her motion, the petitioner merely provided the court with points and authorities consisting of only 12 words listing sections 2241, 2255, and *Culter.* Pet'r Mot.

to the federal habeas statute, 28 U.S.C. § 2241. *Chatman–Bey v. Thornburgh,* 864 F.2d 804, 809 (D.C.Cir.1988); *United States v. Jalili,* 925 F.2d 889, 893 (6th Cir.1991) (citing *United States v. Hutchings,* 835 F.2d 185, 186 (8th Cir.1987)). For purposes of the federal habeas statute, an individual released on his own recognizance pending execution of his sentence is nonetheless in custody and may bring a habeas petition. *Hensley v. Mun. Ct.,* 411 U.S. 345, 351, 93 S.Ct. 1571 (1973). A petitioner may pursue a habeas petition under section 2241 only after he has exhausted all of his administrative remedies. *Chatman–Bey,* 864 F.2d at 809 (noting that Congress has amended the habeas statute to require exhaustion of remedies). Finally, "the law in this circuit is clear that '[a] district court may not entertain a habeas corpus petition unless it has personal jurisdiction over the custodian of the prisoner.'" *Chatman–Bey,* 864 F.2d at 810 (citing *Guerra v. Meese,* 786 F.2d 414, 415 (D.C.Cir.1986)).

### 3. Legal Standard for Due–Process Claims

#### a. The Due Process Clauses of the Fifth and Fourteenth Amendments

The Constitution's two Due Process Clauses are embodied in the Fifth and Fourteenth Amendments, and each "guarantee[s] a level of procedural protection before a person's life, liberty or property can be impinged upon by the government." *Beo v. District of Columbia,* 44 F.3d 1026, 1027 (D.C.Cir.1995). The Fifth Amendment restrains the federal government from depriving any person of life, liberty, or property without due process of law. U.S. CONST. amend. V. The Fourteenth Amendment, on the other hand, restrains

the states from depriving any person of life, liberty, or property without due process of law. U.S. CONST. amend. XIV, § 1. There is some blurring between the two clauses because both essentially apply the same analysis. *Dusenbery v. United States,* 534 U.S. 161, 167, 122 S.Ct. 694, 151 L.Ed.2d 597 (2002) (stating that "[t]he Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law'"); *Beo,* 44 F.3d at 1029 (discussing whether an agreement made in state court "can create a liberty interest under the Fourteenth or, in this case, the Fifth (because the [District of Columbia] is governed by federal statutes) Amendment"); Ernest H. Schopler, *Annotation: Supreme Court's Views as to Concept of "Liberty" Under Due Process Clauses of Fifth and Fourteenth Amendments,* 47 L.Ed.2d 975, at *1a n. 1 (1999) (clarifying that "the Supreme Court's interpretation of the term 'liberty' is the same for the purposes of the Fifth and Fourteenth Amendments").

#### b. Substantive and Procedural Due Process

Under either the Fifth or Fourteenth Amendment, there are two types of due-process claims: substantive and procedural. *Demore v. Hyung Joon Kim,* —— U.S. ——, ——, 123 S.Ct. 1708, 1732, 155 L.Ed.2d 724 (2003) (stating that in relation to the Fifth and Fourteenth Amendments, "[t]he substantive demands of due process necessarily go hand in hand with the procedural"). Substantive due-process rights attach only when a fundamental right is involved, thus ensuring that the government does not unjustifiably infringe on that right.[3] *Hutchins v. District of Co-*

---

**3.** Fundamental rights are few. The history of

substantive due process "counsels caution

*lumbia,* 188 F.3d 531, 535 (D.C.Cir.1999). The protection of fundamental rights derives from the substantive component of the Fifth Amendment's Due Process Clause, which protects those rights that are "implicit in the concept of ordered liberty." *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937). Because not all rights enumerated in the Bill of Rights are fundamental, restrictions on non-fundamental rights do not warrant strict-scrutiny analysis. *Hutchins,* 188 F.3d at 538. Rather, courts review restrictions on non-fundamental rights under a rational-basis test. *Washington v. Glucksberg,* 521 U.S. 702, 728, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997); *Reno v. Flores,* 507 U.S. 292, 305, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993).

For procedural due process to attach, a person must have more than an abstract need or desire to have a life, liberty, or property interest. *Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Simply put, a person must have a legitimate claim of entitlement to such an interest. *Id.* The Constitution does not create these interests; rather, they are defined by existing "rules or understandings that secure certain benefits and that support claims of entitlement." *Id.* For prisoners, "these interests [are] generally limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).[4] If there is such an entitlement, the government must provide adequate procedure, such as a hearing, to protect the individual's reliance interest before taking it away. *Roth,* 408 U.S. at 577, 92 S.Ct. 2701.

#### 4. Legal Standard for Equitable–Estoppel Claims

"[I]t is clear that 'the fundamental principle of equitable estoppel applies to government agencies, as well as private parties.'" *Grumman Ohio Corp. v. Dole,* 776 F.2d 338, 347 (D.C.Cir.1985) (quoting *Investors Research Corp. v. Sec. & Exch.*

---

and restraint" in deciding what constitutes a fundamental right. *Moore v. East Cleveland,* 431 U.S. 494, 502, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977). For example, the Court has rejected education and the receipt of public welfare as fundamental rights. *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

4. The court is aware that *Sandin* addresses liberty interests created by state law rather than federal regulations such as the DOJ policy at issue here. *Sandin,* 515 U.S. at 484, 115 S.Ct. 2293. Yet prior to *Sandin,* the D.C. Circuit in *Ostrer v. Bureau of Prisons,* 1989 WL 128033 (D.C.Cir. Sept.6, 1989), considered whether the BOP had created a liberty interest in a federal inmate's halfway-house placement through certain prison regulations. *Id.* at *1. Though addressing federal prison regulations, *Ostrer* relied exclusively on cases involving liberty interests created under the Fourteenth Amendment by state law. *Id.* (cit-

ing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) and *Olim v. Wakinekona,* 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983)). As discussed *infra* in more detail, the Supreme Court in *Sandin,* while specifically declining to overrule either *Thompson* or *Wakinekona,* abandoned the methodology that those cases, and by extension *Ostrer,* applied. *Sandin,* 515 U.S. at 484 n. 5, 115 S.Ct. 2293. Because Fifth and Fourteenth Amendment due-process analyses mirror one another, our court of appeals has applied *Sandin* analysis while considering due-process claims under the Fifth Amendment. *Franklin v. District of Columbia,* 163 F.3d 625, 634–35 (D.C.Cir.1998) (finding that the court below should have applied the *Sandin* test to a prisoner's Fifth Amendment due process claim). Given this mirroring, and that *Ostrer* likened state-created liberty interests to those created by federal regulations, *Sandin* appears to be the controlling Supreme Court precedent in this area of law. *Id.; Ostrer,* 1989 WL 128033, at *1.

*Comm'n*, 628 F.2d 168, 174 n. 34 (D.C.Cir. 1980) and citing *Gen. Accounting Office v. Gen. Accounting Office Personnel Appeals Bds.*, 698 F.2d 516, 526 n. 57 (D.C.Cir. 1983)). Nevertheless, "traditionally there had been a reluctance to apply the doctrine against the government." *Id.* The Supreme Court has declined to rule, however, that the government can never be estopped, but has stated that "the private party surely cannot prevail without at least demonstrating that the traditional elements of an estoppel are present." *Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 61, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). The traditional elements of equitable estoppel include that

> [i]f one person makes a definite misrepresentation of fact to another person having reason to believe that the other will rely upon it and the other in reasonable reliance upon it does an act ... the first person is not entitled ... to regain property or its value that the other person acquired by the act, if the other in reliance upon the misrepresentation and before discovery of the truth has so changed his position that it would be unjust to deprive him of that which he thus acquired.

*Id.* at 59, 104 S.Ct. 2218 (quoting Restatement (Second) of Torts § 894(1) (1979)). Thus, "the party claiming the estoppel must have relied on its adversary's conduct in such a manner as to change his position for the worse, and that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." *Id.* (citing *Wilber Nat'l Bank v. United States*, 294 U.S. 120, 124–25, 55 S.Ct. 362, 79 L.Ed. 798 (1935)) (internal quotation and footnote omitted). The D.C. Circuit has also concluded that " 'estoppel generally requires that government agents engage—by commission or omission—in conduct that can

be characterized as misrepresentation or concealment, or at least, behave in ways that have or will cause an egregiously unfair result.' " *Grumman*, 776 F.2d at 347 (quoting *Gen. Accounting Office*, 698 F.2d at 526).

## B. The Court Has Jurisdiction to Entertain the Petitioner's Motion

### 1. The Court May Exercise Jurisdiction Under 28 U.S.C. § 2255

As stated, the petitioner may use section 2255 to attack the validity or lawfulness of her sentence. *Gomori*, 533 F.2d at 875. Section 2255 only allows a petitioner to challenge his sentence's validity in the three instances where: (1) the court concludes that it was without jurisdiction to impose the sentence; (2) the sentence was in excess of the maximum authorized by law; or (3) the sentence is otherwise subject to collateral attack. *Addonizio*, 442 U.S. at 185, 99 S.Ct. 2235. In this case, collateral attack is the only jurisdictional avenue available for the petitioner to challenge her sentence because the court had jurisdiction to impose the sentence and the sentence was within the relevant sentencing guideline ranges. *Id.*

The government likens this case to *Addonizio*, in which the Court found that a sentencing judge's incorrect assumptions based on past parole proceedings did not rise to the level where it could be collaterally attacked as an objectively ascertainable error. *Id.* at 186, 187, 99 S.Ct. 2235; Gov't's Opp'n at 5–6. Although, the government argues that *Addonizio* precludes jurisdiction, Gov't's Opp'n at 5–6, courts have distinguished *Addonizio* when applying it to the new DOJ policy because that policy involves constitutional claims going to the validity of imposed sentences where-

as *Addonizio* was devoid of such claims. *Howard v. Ashcroft,* 248 F.Supp.2d 518, 531–32 (M.D.La.2003) (stating that under *Addonizio,* a court has jurisdiction to discharge a prisoner or resentence him if it concludes that the sentence resulting from the new DOJ policy is subject to collateral attack pursuant to section 2255); *Pearson v. United States,* 265 F.Supp.2d 973, 980–81 (E.D.Wis.2003) (determining that the petitioner's due-process claim and the court's reliance on misinformation make the sentence resulting from the new DOJ policy cognizable under section 2255); *Iacaboni v. United States,* 251 F.Supp.2d 1015, 1044 (D.Mass.2003) (noting that in contrast to the petitioner's challenge of the new DOJ policy, *Addonizio* specifically declined to consider any constitutional question); *see also Ferguson v. Ashcroft,* 248 F.Supp.2d 547, 558 (M.D.La.2003) (observing that section 2255 is a proper jurisdictional vehicle to challenge the new DOJ policy because the resulting change "undermined the validity of [the petitioner's] sentence").

Much like the petitioners in those cases, the petitioner here raises a constitutional claim which goes to the validity of the petitioner's sentence, thus making the petitioner's challenge a proper subject of collateral attack. *Id.* In addition, the petitioner suggests that the new DOJ policy, even though it affects a matter determined subsequent to sentencing—namely, the placement of a prisoner—renders invalid the imposed sentence because of the court's reliance on the possibility of CCC placement while fashioning the sentence. Pet'r Mot. (citing *Culter,* 241 F.Supp.2d 19). Therefore, this "is the proper court to hear this claim because it is . . . here that [the petitioner's] sentence was imposed in the first place." *Ferguson,* 248 F.Supp.2d at 558; *see also Howard,* 248 F.Supp.2d at 531–32; *Pearson,* 265

F.Supp.2d at 980–81; *Iacaboni,* 251 F.Supp.2d at 1044.

**2. The Court Dismisses Without Prejudice the Petitioner's Section 2241 Motion for Failure to Name Her Custodian as a Respondent**

In addition to challenging the validity of her sentence, the petitioner contests the manner in which federal prison authorities are executing that sentence under section 2241. Pet'r Mot.; *see also Chatman–Bey,* 864 F.2d at 809; *Jalili,* 925 F.2d at 893; *Combs v. Attorney General,* 260 F.Supp.2d 53, 56 (D.D.C.2003) (Walton, J.) (declining to address the new DOJ policy under section 2241). Specifically, the petitioner pins the blame for the change in her custodial placement on the new DOJ policy. Pet'r Mot. Although the court has stayed the execution of the petitioner's sentence, she remains "in custody" for habeas purposes and may therefore properly assert her claim under section 2241. *Combs,* 260 F.Supp.2d at 56–57 (citing *Hensley,* 411 U.S. at 351, 93 S.Ct. 1571). As noted, the petitioner's failure to exhaust all of her administrative remedies usually would be fatal to her section 2241 petition. *Chatman–Bey,* 864 F.2d at 809; *Rourke v. Thompson,* 11 F.3d 47, 50 (5th Cir.1993) (stating that "a federal prisoner seeking only injunctive relief [under section 2241] must first exhaust the administrative remedies provided by the [BOP]"). There is authority, however, for waiving the exhaustion requirement when seeking administrative remedies would be patently futile. *Fuller v. Rich,* 11 F.3d 61, 62 (5th Cir.1994); *see also Ezratty v. Puerto Rico,* 648 F.2d 770, 774 (1st Cir.1981) (not requiring exhaustion when the issue is a "pure matter of law") (Breyer, J.). Although other courts addressing this issue have determined that the new DOJ policy has made exhaustion futile, such a determination is not necessary here because

there lies a clear hurdle under section 2241 that the petitioner cannot overcome. *E.g., Ferguson,* 248 F.Supp.2d at 564 (citing *Tasby v. Pratt,* 2002 WL 1160071, at *2 (N.D.Tex.2002)). Specifically, the plaintiff has not named her custodian as a respondent in this action. Pet'r Mot. at 1 (naming only the "United States of America" as the respondent).

■ Here, the custodian for habeas purposes could be the warden of the federal prison camp in Alderson, West Virginia, which is where the BOP has designated the petitioner for confinement. *Combs,* 260 F.Supp.2d at 56–57 (citing *McCall v. Swain,* 510 F.2d 167, 175 n. 16 (D.C.Cir. 1975)); BOP Letter dated Jan. 17, 2003. Because the named respondent in this action is not the petitioner's custodian, this court is compelled to conclude that the petitioner has improperly asserted her section 2241 challenge. *Combs,* 260 F.Supp.2d at 56. Moreover, had the petitioner named the custodian as a respondent in this action, the court entertains some doubts as to whether it would have had personal jurisdiction over the custodian if the custodian in fact is the warden of the federal prison camp because that facility is located outside this forum in West Virginia. *See id.* at 58–59; *Chatman–Bey,* 864 F.2d at 810. For these reasons, the court dismisses the petitioner's section 2241 motion without prejudice. *Chatman–Bey,* 864 F.2d at 810; *Combs,* 260 F.Supp.2d at 56. Nevertheless, as noted earlier, the court retains jurisdiction over the matter under section 2255 and therefore will consider the petitioner's due-process and equitable-estoppel claims on their merits. In other words, the court's dismissal of the petitioner's section 2241 motion does not prevent the court from adjudicating the petitioner's asserted substantive claims.

## C. The Petitioner Fails to Meet the Required Evidentiary Burden Under 28 U.S.C. § 2255

■ Under section 2255, the petitioner shoulders the burden of sustaining her contentions by a preponderance of the evidence. *Simpson,* 475 F.2d at 935. This burden is especially crucial given the extraordinary relief contemplated here. *Addonizio,* 442 U.S. at 184, 99 S.Ct. 2235; *Pollard,* 959 F.2d at 1020; *Hodges,* 156 F.Supp. at 314. Here, the petitioner's "brief" in support of her motion consists of 12 words and is completely devoid of any legal argument or analysis. Pet'r Mot. Furthermore, the petitioner has failed to file a reply to the government's opposition brief. This court, like all others, relies on the adversarial system to bring just and fair results in the cases before it. But if the court were to strictly rely on the petitioner's motion in reaching a resolution here, it would have to ignore key issues and related authority in doing so. As one court has remarked, the premise of an adversarial system is that courts do not sit as self-selected entities of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them. *Tom v. Heckler,* 779 F.2d 1250, 1259–60 (7th Cir.1985) (Posner, J., dissenting). Because the petitioner has failed to argue her case, the court could deny the petitioner's few-worded motion on the basis that it does not satisfy her evidentiary burden under section 2255. *Simpson,* 475 F.2d at 935. Giving every benefit of the doubt to the petitioner, however, the court will overlook the paucity of the petitioner's motion and address the petitioner's due-process and equitable-estoppel claims assuming *arguendo* that her mere citation to section 2255 and *Culter* presents a basis for the court to substantively review those claims.

### D. The New DOJ Policy Does Not Offend Due Process

#### 1. The Petitioner Has No Liberty Interest in a CCC

The petitioner's due-process claim challenges the new DOJ policy, which, as applied to her, mandates that the BOP place her in a prison rather than in a CCC.[5] BOP Letter dated Jan. 17, 2003; *see also* DOJ Mem. at 1. Because the DOJ and the BOP are federal agencies administered by the executive branch and using congressionally-delegated power, the petitioner's due-process challenge is properly framed under the Fifth Amendment's Due Process Clause. U.S. CONST. amend. V; *Dusenbery*, 534 U.S. at 167, 122 S.Ct. 694.

The petitioner cannot make out a substantive due-process claim under the Fifth Amendment because substantive due process only attaches when a fundamental right is at stake. *Hutchins*, 188 F.3d at 535; *Beo*, 44 F.3d at 1028 (quoting *Rochin v. California*, 342 U.S. 165, 172–73, 72 S.Ct. 205, 96 L.Ed. 183 (1952) and *Planned Parenthood v. Casey*, 505 U.S. 833, 846–48, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)).

The D.C. Circuit, echoing the Supreme Court, has recognized that " 'the guideposts for responsible decisionmaking in this uncharted area are scarce and openended,' " and so " 'has always been reluctant to expand the concept of substantive due process.' " *Beo*, 44 F.3d at 1028 (quoting *Albright v. Oliver*, 510 U.S. 266, 271–72, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992))). As a result, substantive due-process protections " 'have for the most part been accorded to matters relating to marriage, family, procreation and the right to body integrity.' " *Id.* Put another way, CCC placement is not "implicit in the concept of ordered liberty" and the petitioner therefore has no substantive due-process claim to it. *Palko*, 302 U.S. at 325, 58 S.Ct. 149. Thus, any interest that the petitioner can claim in a CCC surely cannot rise to so high a level as to qualify as a fundamental right. *Id.; Beo*, 44 F.3d at 1028.

The petitioner's procedural due-process claim gives the court greater

**5.** Notwithstanding the retroactive nature of the new DOJ policy, the petitioner has not raised an *ex post facto* challenge. For this reason, the court need not address the government's preemptive *ex post facto* arguments. Several district courts, however, have applied *ex post facto* analysis to the new DOJ policy, although those courts have not reached a consensus on the subject, remaining split on whether the policy violates the Constitution's *Ex Post Facto* Clause. *See Ashkenazi v. Attorney General of the United States*, 246 F.Supp.2d 1 (D.D.C.2003) (Kessler, J.); *United States v. Serpa*, 251 F.Supp.2d 988 (D.Mass.2003); *Tipton v. Bureau of Prisons*, 262 F.Supp.2d 633 (D.Md.2003); *Byrd v. Moore*, 252 F.Supp.2d 293 (W.D.N.C.2003); *United States v. Gilbride*, 2003 WL 297563, U.S. Dist. LEXIS 1869 (M.D.Pa. Jan. 31, 2003); *United States v. Schild*, 2003 WL 260672, 2003 U.S. Dist. LEXIS 1703 (D.Kan.

Jan. 21, 2003); *United States v. Kramer*, 2003 WL 1964489, 2003 U.S. Dist. LEXIS 7212 (N.D.Ill. Apr. 28, 2003); *United States v. Pena*, 2003 WL 21197024, 2003 U.S. Dist. LEXIS 8502 (W.D.N.Y. May 16, 2003); *Borgetti v. Bureau of Prisons*, 2003 WL 743936 (N.D.Ill. Feb.14, 2003).

The court also notes that the new DOJ policy has been challenged under the Administrative Procedure Act, another claim not raised by the petitioner in the case at bar. *See Iacaboni*, 251 F.Supp.2d 1015; *Mallory v. United States.*, 2003 WL 1563764, 2003 U.S. Dist. LEXIS 4522 (D.Mass. Mar. 25, 2003); *Tipton*, 262 F.Supp.2d 633; *Byrd*, 252 F.Supp.2d 293; *Howard*, 248 F.Supp.2d 518; *Ferguson*, 248 F.Supp.2d 547; *Godbout v. United States*, 2003 U.S. Dist. LEXIS 12294 (D.Mass. May 2, 2003); *Estes v. Fed. Bureau of Prisons*, 273 F.Supp.2d 1301 (S.D.Ala.2003).

pause.[6] The petitioner appears to assert that she had a legitimate claim of entitlement to her original CCC designation. *Roth*, 408 U.S. at 577, 92 S.Ct. 2701. Because there is no *per se* life or property interest at stake, any CCC entitlement, if it exists, must be called a liberty interest. *Franklin v. District of Columbia*, 163 F.3d 625, 631 (D.C.Cir.1998) (stating that "[w]hen neither life nor property is involved, courts—speaking in a sort of shorthand—talk of the need to find a 'liberty interest' before considering what process is due under the Fifth Amendment (or the Fourteenth Amendment)" (paranthetical in original)) (citing *Wolff v. McDonnell*, 418 U.S. 539, 556–58, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). If the petitioner has a liberty interest in a CCC, it is not created by the Constitution but by existing "rules or understandings that secure certain benefits and that support certain claims of entitlement." *Roth*, 408 U.S. at 577, 92 S.Ct. 2701; *see also Franklin*, 163 F.3d at 631 (citations omitted).

At first blush, it would seem that the "rules or understandings" at issue in this case are the BOP's regulations—as modified by the new DOJ policy—that control the petitioner's access to a CCC, and any liberty interest that she can assert in a CCC must flow through them. *See id; Hewitt v. Helms*, 459 U.S. 460, 466, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). The government persuasively argues that no such liberty interest exists, relying on *Ostrer v. Bureau of Prisons*, in which the D.C. Circuit reasoned that

> [t]he prison regulations governing halfway house[7] placement do not contain either "explicitly mandatory language"

or any "particularized standards or criteria" limiting the Bureau of Prisons' discretion which give rise to any constitutionally protected interest in halfway house placement. *See, e.g., Kentucky Department of Corrections v. Thompson*, 490 U.S. 454, 109 S.Ct. 1904, 1909–10, 104 L.Ed.2d 506 (1989); *Olim v. Wakinekona*, 461 U.S. 238, 249, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983).... Thus, any decision to rescind approval of a halfway house placement for appellant, prior to his actual placement, did not violate any constitutional entitlement created by the prison regulations.

*Ostrer v. U.S. Bureau Prisons*, 1989 WL 128033, at *1 (D.C.Cir. Sept.6, 1989). On its face, *Ostrer* settles the issue of whether the petitioner can have a liberty interest in a CCC with a resounding "no." *Id.* What complicates the matter is that the cases on which *Ostrer* relies stem from the reasoning embodied by the Supreme Court in *Hewitt*. *Id.* (citing *Thompson*, 490 U.S. at 461, 109 S.Ct. 1904 (stating that "our method of inquiry in these cases has always been to examine closely the language of the relevant statutes and regulations") and *Wakinekona*, 461 U.S. at 249, 103 S.Ct. 1741 (reasoning that "a State creates a protected liberty interest by placing substantive limitations on official discretion")); *see also Hewitt*, 459 U.S. at 472, 103 S.Ct. 864. Twelve years after the Supreme Court decided *Hewitt*, it abandoned *Hewitt*'s approach in *Sandin* upon the reasoning that *Hewitt*'s methodology "create[d] disincentives for States to codify prison management procedures" "by encouraging prisoners to comb regulations in search of mandatory language on which to base enti-

---

**6.** Though not stated outright, the court in *Culter* seemed to be proceeding under a procedural due-process rubric. *Culter*, 241 F.Supp.2d at 26 (citing *DeWitt v. Ventetoulo*, 6 F.3d 32, 34 (1st Cir.1993) (discussing due

process in relation to issues of fundamental fairness as opposed to fundamental rights)).

**7.** "Halfway house" is the generic term for a CCC.

tlements to various state-conferred privileges." *Sandin,* 515 U.S. at 481–82, 484, 115 S.Ct. 2293. The *Sandin* Court also discovered that "the *Hewitt* approach [had] led to the involvement of federal courts in the day-to-day management of prisons, often squandering judicial resources with little offsetting benefit to anyone." *Id.* at 482, 115 S.Ct. 2293.[8] In rejecting *Hewitt*'s methodology, *Sandin* refocused the test for identifying state-created liberty interests, stating that

> these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, ... nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

*Id.* at 484, 115 S.Ct. 2293.

In light of *Sandin,* the D.C. Circuit clarified *Hewitt*'s origins in *Hatch v. District of Columbia,* 184 F.3d 846 (D.C.Cir.1999), explaining that in *Hewitt,*

> a Pennsylvania inmate challenged the adequacy of proceedings that resulted in his confinement in administrative segregation after a prison riot. While observing that administrative segregation does not implicate "an interest independently protected by the Due Process Clause," ... *Hewitt* found that the prisoner had a

protected liberty interest in avoiding such segregation because state law "required that certain procedures 'shall,' 'will,' or 'must' be employed and that administrative segregation will not occur absent specified substantive predicates .... The repeated use of explicitly mandatory language in connection with requiring specific substantive predicates," *Hewitt* explained, "demands a conclusion that the State has created a protected liberty interest."

*Id.* at 850 (quoting *Hewitt,* 459 U.S. at 472, 103 S.Ct. 864) (internal citations omitted). Thus, under *Hewitt* analysis, a liberty interest could stem from either state or federal statutes or regulations that contain " 'explicitly mandatory language' " restricting prison authorities' discretion "to impose conditions on the confinement of inmates or to assign them to particular prisons." *Beo,* 44 F.3d at 1028 (quoting *Hewitt,* 459 U.S. at 471–72, 103 S.Ct. 864 and citing *Thompson,* 490 U.S. at 462–63, 109 S.Ct. 1904).

As noted, *Ostrer* expressly relies on *Hewitt* methodology, both in terms of the cases it cites and its focus on "explicitly mandatory language" and "particularized standards or criteria" limiting the BOP's discretion. *Ostrer,* 1989 WL 128033, at *1. Thus the precedential value of *Ostrer,* an opinion which would mark a quick defeat

---

**8.** *Sandin* offered a sampling of some of the cases that had resulted from *Hewitt*'s approach to liberty interests, *Sandin,* 515 U.S. at 483, 115 S.Ct. 2293, including: *Klos v. Haskell,* 48 F.3d 81, 82 (2d Cir.1995) (claiming liberty interest in right to participate in a "shock program"(a type of boot camp for inmates)); *Segal v. Biller,* 1994 WL 594705, *1, 1994 U.S.App. LEXIS 30628, at *3–4 (9th Cir., Oct. 31,1994) (unpublished) (seeking liberty interest in a waiver of the travel limit imposed on prison furloughs); *Burgin v. Nix,* 899 F.2d 733, 735 (8th Cir.1990) (arguing for a liberty interest in receiving a tray lunch rather than a sack lunch); *Spruytte v. Walters,* 753 F.2d 498, 506–08 (6th Cir.1985) (finding liberty interest in receiving a paperback dictionary due to a rule that allows a prisoner to "receive any book ... which does not present a threat to the order or security of the institution"); *Lyon v. Farrier,* 727 F.2d 766, 768–69 (8th Cir.1984) (claiming both a liberty interest in a prison job and freedom from transfer to a smaller cell without electrical outlets for televisions); *United States v. Michigan,* 680 F.Supp. 270, 277 (W.D.Mich.1988) (finding liberty interest in not being placed on a food-loaf diet).

to the petitioner's procedural due-process claim, remains an open question.

That said, the instant case does not require the court to review the new DOJ policy under a *Hewitt* lens because, as the D.C. Circuit has instructed, decisions concerning whether a prisoner should be confined in a CCC are "commonplace judgments" that the court must review under *Sandin* because they involve the "day-to-day management of prisons." *Franklin,* 163 F.3d at 634–35 (quoting *Sandin,* 515 U.S. at 482, 115 S.Ct. 2293). Thus, *Hewitt, Ostrer,* and their progeny have no bearing on the case at bar.

Turning the focus onto *Sandin,* the D.C. Circuit has already provided instruction on *Sandin*'s applicability to prison placement. In *Franklin,* the D.C. Circuit clarified that housing determinations do not give rise to liberty interests and explained that

> [d]ecisions about where a prisoner should be confined, at what level of custody[ ] (maximum, close, medium, minimum, or *community* ) he should be classified, when he should be transferred and so forth are commonplace judgments in the "day-to-day management of prisons." *Sandin,* 515 U.S. at 482, 115 S.Ct. 2293. Unless the prisoner is subjected to some extraordinary treatment, such as transfer to a mental hospital, [ ] the effect of those judgments on prisoners—that is, the restriction of their liberty—is the ordinary consequence of confinement for committing a crime.

*Franklin,* 163 F.3d at 634–35 (internal citation omitted and emphasis added).

In the petitioner's case, she has not been subject to any "extraordinary treatment" because prison housing and transfers are issues within the "day-to-day management of prisons." [9] *Id.; Sandin,* 515 U.S. at 484, 115 S.Ct. 2293. Because the petitioner's placement is a day-to-day prison management issue, her custodial status change from a CCC to a prison does not constitute an "atypical and significant hardship on [her] in relation to the ordinary incidents of prison life." *Id.* For this reason, the petitioner has no liberty interest in a CCC. *Id.* Because there is no liberty interest at stake, the court need not determine whether the BOP afforded the petitioner adequate procedural protections, and therefore cannot rule in favor of her due-process claim. *See Roth,* 408 U.S. at 577, 92 S.Ct. 2701.

## 2. The Sentencing Guidelines Preclude Modification of the Petitioner's Sentence Even if the Court Made an "Objectively Ascertainable Error"

██ The D.C. Circuit has suggested that the presence of an "objectively ascertainable error" during sentencing can on its own give rise to a procedural due-process violation under section 2255. *United States v. Coyer,* 732 F.2d 196, 201 (D.C.Cir.1984) (suggesting that the presence of an objectively ascertainable error would have created a due process violation); *King,* 825 F.2d at 724–25 (determining that an objectively ascertainable error deprived the defendant of due process at sentencing). Objectively ascertainable errors are present where the sentencing judge relies on misinformation in forming

**9.** The D.C. Circuit has held that there remain instances where looking to regulation language constitutes proper procedural due-process analysis. *Ellis v. District of Columbia,* 84 F.3d 1413, 1418 (D.C.Cir.1996) (stating that the *Sandin* test is ill-fitted to consider parole eligibility determinations because its strict application would mean that "no matter what state law provides, a prisoner's interest in parole can never amount to a liberty interest" protected by due process). Nevertheless, because the D.C. Circuit has held that prison-housing determinations are a day-to-day prison management issue, *Sandin* is the correct analytical lens for the case at bar. *Franklin,* 163 F.3d at 634–35.

a defendant's sentence. *E.g., King*, 825 F.2d at 725 (noting that the sentencing judge's incorrect understanding of the defendant's minimum statutory parole eligibility date constituted an objectively ascertainable error).

In this case, the court received private assurances from probation officials that the BOP would place the petitioner in a CCC to serve the court's imposed five-month custodial term. Even absent these assurances, at a minimum the court would have imposed its sentence based on over 15 years of BOP practice that CCC placement was a possibility for the petitioner. Still, the court knew all the while that the BOP enjoyed the discretion to decline the court's recommendation. With these variables in mind, the court fashioned a sentence that would allow the petitioner and her husband to serve staggered CCC terms so as to minimize the resulting negative externalities that would emanate from an extended separation from their children. Tr. dated Nov. 5, 2002, at 9–11. While the court does not believe that the government affirmatively misled the court, the court concludes that the new DOJ policy did more than merely frustrate the court's expectations regarding the petitioner's CCC placement. *See Culter*, 241 F.Supp.2d at 28. Accordingly, the question now becomes whether an objectively ascertainable error is present under these facts. *King*, 825 F.2d at 724–25.

The D.C. Circuit's decision in *Coyer* helps to answer this question. In that case, the D.C. Circuit held that a probation officer's estimate, represented as such, about "the Parole Commission's likely action did not represent a factual determination upon which the District Court could reasonably rely." *Coyer*, 732 F.2d at 200. The D.C. Circuit also commented that the probation officer was a court employee whose estimates the district court impermissibly sought to make binding on the Parole Commission, an agency of the executive branch. *Id.* By the same token, here the court relied on the assurances of a probation officer concerning the likely conduct of the BOP. In following *Coyer*, this court cannot make the statements of a court official binding on the BOP and the executive branch as a whole. *Id.*

Assuming for the moment that the court properly relied on either the probation officer's assurances or the BOP's prior policy, thus creating an objectively ascertainable error in the court's mind, the nature of the U.S. Sentencing Guidelines precludes granting the petitioner relief under section 2255. Indeed, under the guidelines, the court must satisfy the minimum term of imprisonment for a Zone C offender, such as the petitioner, by either

> (1) a sentence of imprisonment; or (2) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention ... provided that at least one-half of the minimum term is satisfied by imprisonment.

U.S.S.G. § 5C1.1(d)(1) & (2) (Nov.2000); *see also* U.S.S.G. § 5C1.1(d)(1) & (2), comment (n.4). The petitioner's total offense level was 12 and her criminal-history category was I, producing a sentencing range of 10–16 months for her custodial term. Sentencing Table (Nov.2000). The court gave the petitioner 10 months, with half of that term (five months) to be served in a CCC (thus fulfilling section 5C1.1(d)(2)'s "imprisonment" requirement) and the remaining half to be served in home detention. Tr. dated Nov. 5, 2002, at 11. In sum, the court gave the petitioner the lowest custodial sentence possible under the guidelines. *Id.*

The court's efforts to impose the lowest sentence possible are significant because for an objectively ascertainable error to be

present, the court must have imposed a sentence different from the one it otherwise would have issued had it not relied on the misinformation. *E.g., Coyer*, 732 F.2d at 199 (recognizing that the district court's "undisputed reliance upon this erroneous estimate resulted in the imposition of a longer sentence than otherwise would have been imposed"); *see also Iacaboni*, 251 F.Supp.2d at 1042–43 (stating that the court "made an 'objectively ascertainable error' in imposing these sentences [because without the misinformation] there is every likelihood the sentences would have been different"); *Pearson*, 265 F.Supp.2d 973, 980 (citing *Iacaboni*, 251 F.Supp.2d at 1042–43). In other words, even had the court clairvoyantly anticipated the coming of the new DOJ policy, it would nevertheless have imposed the same custodial term because that term was the minimum sentence available to the court under the guidelines. Tr. dated Nov. 5, 2002, at 8–11; Sentencing Table (Nov.2000). Therefore, to the extent that the presence of an objectively ascertainable error could trigger due-process concerns, the court cannot rule in favor of the petitioner on this ground.

### E. The New DOJ Policy Does Not Violate Principles of Equitable Estoppel

■ Because fundamental principles of equitable estoppel apply to governmental agencies just as they do to private parties, the court may entertain the petitioner's estoppel claim against the government.[10]

*Grumman*, 776 F.2d at 347; *Gen. Accounting Office*, 698 F.2d at 526 n. 57; *Investors Research Corp.*, 628 F.2d at 174 n. 34. Although this circuit has shown great reluctance to apply the doctrine against the government, and the Supreme Court has offered no circumstances under which estoppel could apply to a government agency, "the private party surely cannot prevail without at least demonstrating that the traditional elements of an estoppel are present." *Id.; Heckler*, 467 U.S. at 61, 104 S.Ct. 2218. These traditional elements include "one person mak[ing] a definite misrepresentation of fact to another person" and that other person reasonably relying on the misrepresentation to his detriment. *Heckler*, 467 U.S. at 59, 104 S.Ct. 2218.

■ Here, the government has made no misrepresentation (nor any representation for that matter) to the petitioner concerning her CCC placement. First, the record of the petitioner's plea hearing indicates that she received no promises other than those outlined in the plea agreement discussing her sentencing range:

> THE COURT: Has anybody made you any promise other than those which are contained in the plea agreement you've [ ] signed? Ms. Smith?

> MS. SMITH: No.

> \*　　\*　　\*　　\*　　\*　　\*

> THE COURT: ... Ms. Smith, do you know and understand, as indicated in

---

10. Though not specifically addressed by the parties, the court considered applying the doctrine of judicial estoppel to the new DOJ policy because of the suggestion that a misrepresentation was perpetrated against the court. A court can assert judicial estoppel when "a party prevails on a claim in one court and proceeds in a calculated manner to manipulate a second court by asserting facts at odds with those advanced before the first court." *Am. Methyl Corp. v. Env'l Prot. Agen-*cy, 749 F.2d 826, 833 (D.C.Cir.1984). Because the facts of this case did not fit neatly within the framework of judicial estoppel, and because the D.C. Circuit has been wary of a doctrine so " 'out of harmony with [the modern rules of pleading]' and at odds with the truth-seeking function of courts," this court declines to further pursue this approach. *Id.; Konstantinidis v. Chen*, 626 F.2d 933, 938–39 (D.C.Cir.1980).

the plea agreement you signed, that the penalty that may be imposed in connection with a conviction on this charge is a sentence of imprisonment of up to five years, a fine of up to $250,000 or both? ...

MS. SMITH: Yes.

Tr. dated Oct.1, 2001, at 13–16. Second, the petitioner's plea agreement itself contains no promises of CCC placement by the government. *See generally* Plea Agreement. Finally, at the petitioner's sentencing hearing, the court plainly stressed that it was only making a recommendation to the BOP as to her CCC placement:

THE COURT: [I]t is the judgment of the court, Ms. Smith, that you should be committed to the custody of the Bureau of Prisons to be imprisoned for a term of five months on count 1. That sentence will be served at a community correction[s] center. The court will recommend to the Bureau of Prisons that that sentence will be served at a community correction[s] center.

Tr. dated Nov. 5, 2002, at 11. Thus, even had the petitioner relied on the probability of CCC placement in settling her affairs before reporting to detention, the petitioner's subjective reliance could not be called reasonable under elements of traditional estoppel because the court expressly told her that it was only making a recommendation as to her placement. *Id.; Heckler,* 467 U.S. at 59, 104 S.Ct. 2218.

Unable to succeed under traditional estoppel elements, the petitioner cannot meet the D.C. Circuit's heightened standard for asserting an equitable-estoppel claim against the government. *Grumman,* 776 F.2d at 347; *Gen. Accounting Office,* 698 F.2d at 526. As mentioned earlier, this heightened standard requires that "government agents engage—by commis-

sion or omission—in conduct that can be characterized as misrepresentation or concealment, or at least, behave in ways that have or will cause an egregiously unfair result." *Id.* This court finds nothing in the record suggesting that the government engaged in misrepresentation or concealment. Indeed, nothing in the plea agreement, plea hearing, or sentencing hearing indicates a misrepresentation to the petitioner. *See generally* Plea Agreement; Tr. dated Oct. 1, 2001; Tr. dated Nov. 5, 2002. Nor does the court believe that the new DOJ policy would cause "an egregiously unfair result" because the government did not hide the mutability of the petitioner's CCC status given that the BOP could have decided against the court's recommendation and changed the petitioner's CCC status at any time prior to the new DOJ policy. *Grumman,* 776 F.2d at 347; *Jalili,* 925 F.2d at 893. In summary, although the petitioner may view the new DOJ policy as unfair, it is not odious enough to reach so high a standard as to create "an egregiously unfair result" because the BOP was always free to renege on the petitioner's CCC placement. *Grumman,* 776 F.2d at 347. Accordingly, the court cannot rule in favor of the petitioner's equitable-estoppel claim.

## IV. CONCLUSION

For the foregoing reasons, the court denies the petitioner's section 2255 motion and dismisses without prejudice the petitioner's section 2241 motion. Given the effects of the shift in policy, however, the court will allow the execution of the petitioner's custodial term to remain stayed for 30 days from the issuance of this ruling so that she can make the necessary preparations before she voluntarily surrenders herself to the BOP's custody. In addition, if the petitioner so desires, the court will recommend that the BOP designate the

petitioner to a prison facility closer to her home rather than to the currently designated facility in Alderson, West Virginia. An order directing the parties in a manner consistent with this Memorandum Opinion is separately and contemporaneously issued this 19th day of August 2003.